Cosme ALVARADO–CARILLO, Petitioner–Appellant,

v.

IMMIGRATION & NATURALIZATION SERVICE, Respondent–Appellee.

Docket No. 98–4305.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 2000.

Decided May 8, 2001.

**46**

Anne Pilsbury (Amelia Shogan, on the brief), Central American Legal Assistance, Brooklyn, NY, for Petitioner.

Meredith E. Kotler, Assistant United States Attorney for the Southern District of New York, New York, N.Y. (Mary Jo White, United States Attorney, Diogenes P. Kekatos and Gideon A. Schor, Assistant United States Attorneys, on the brief), for Respondent.

Before: CARDAMONE, SOTOMAYOR, and KATZMANN, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Cosme Alvarado–Carillo ("petitioner"), a native of Guatemala, petitions for review of a July 21, 1998 decision by the Board of Immigration Appeals ("BIA") denying his applications for asylum and for withholding of deportation (the "BIA Opinion").[1] The BIA explicitly rejected the grounds upon which an immigration judge ("IJ") had previously denied petitioner's applications, but reached the same result based on its identification of a different set of testimonial and evidentiary defects. We find that the BIA Opinion erroneously ignored a substantial portion of petitioner's testimony and other evidence regarding the activities for which he was allegedly persecuted, thereby distorting the BIA's evaluation of the plausibility of petitioner's overall claim and the significance of two inconsistencies in petitioner's testimony. In addition, we find the BIA's conclusion concerning another alleged defect lacks substantial evidence in the record, and that the BIA misapplied its own standard with respect to when an applicant is required to provide additional documentary corroboration.

---

1. The BIA granted petitioner's application for a voluntary departure.

Thus, we vacate the decision but, mindful of the deference generally granted to the BIA, we remand to permit the BIA to re-evaluate petitioner's claim in light of this opinion.[2]

## BACKGROUND

Alvarado–Carillo entered the United States in April 1993. In an Order to Show Cause and Notice of Hearing dated August 2, 1994, the Immigration and Naturalization Service ("INS") charged that he was deportable because he had entered the United States without being inspected by an immigration officer. Petitioner conceded deportability at a hearing on September 13, 1994, but was granted the opportunity to file applications for asylum, withholding of deportation, and voluntary departure. Petitioner's counsel filed the applications on November 12, 1994.

Prior to a scheduled hearing date of October 20, 1995, petitioner became unable to afford the continued services of his counsel and retained new attorneys from Central American Legal Assistance, a nonprofit organization. His new attorneys sought and received an adjournment of the hearing. Subsequently, petitioner's new attorneys became aware that the asylum application filed by petitioner's first attorney was a grossly inaccurate mistranslation of petitioner's Spanish language account of his persecution in Guatemala. On December 1, 1995, petitioner amended his asylum application by submitting an affidavit, dated November 20, 1995, explaining his inability to speak English and providing a more accurate and complete account of his alleged persecution in Guatemala (the "Affidavit").

According to the Affidavit and petitioner's subsequent hearing testimony, petitioner's persecution at the hands of the Guatemalan military was based on: 1) his role in organizing and leading a labor union, the Association of Dock Workers (known by its Spanish acronym ASTRA-PORT), in 1984 during his employment as an accountant at a large semi-private Guatemalan import/export company located at the Puerto Barrios port; 2) his subsequent two-year employment in the mid 1980s at the University of San Carlos, a university whose students and faculty have historically been persecuted by the Guatemalan military; and 3) his friendship with a guerrilla leader, whom he met in 1990 while working for a wood refinery that cut and shipped wood from a jungle area outside the capital city of Guatemala.

Petitioner stated in the Affidavit that his persecution began in 1984 and continued until his departure from the country in 1993. During that time, he claimed, among other things, that he was removed from the union by the government and placed for fifteen days under a form of house arrest that required him to report every morning and afternoon to the local penitentiary. According to the Affidavit, after being fired from his job at the import/export company, he was subjected to physical threats that included: 1) surveillance of his home by armed men in cars of the type commonly known to be used by

---

**2.** We note that pursuant to the transitional provisions of the Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, § 309(c)(1)(B), 110 Stat. 3009–546, 3009–625, petitioner's appeal is properly before us. Although petitioner appeals pursuant to former section 106(a) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a), which was repealed by IIRIRA, IIRIRA's transitional provisions preserve the applicability of the provision for cases such as petitioner's in which deportation proceedings began prior to April 1, 1997 and the relevant deportation order became final after October 30, 1996. *See Diallo v. INS*, 232 F.3d 279, 282–83 n. 1 (2d Cir.2000); *Henderson v. INS*, 157 F.3d 106, 117 (2d Cir.1998).

death squads; and 2) a summons to the Presidential Palace in July 1985, just prior to petitioner's commencement of a job at the University of San Carlos, where he was warned by an army corporal that the army "didn't want any problems with people like [petitioner] at the University of San Carlos" and that he should not associate with "undesirable people" there. Petitioner also claimed to have suffered severe economic persecution in the form of blacklisting that eventually reduced petitioner, a trained accountant, to selling food from carts in the street.

Even at that point, however, petitioner maintains that he continued to be a target for persecution. Specifically, the Affidavit states that "[o]n February 14, 1993, around midnight, the [food] carts were set on fire. Neighbors said that a military truck had come, and some men, dressed as civilians, had set the fire." On February 16, 1993, petitioner was told by a member of the Criminal Investigations Bureau that he was required to present himself again at the Presidential Palace to discuss the fire. Petitioner asserts that to avoid problems, he agreed to sign a statement that the fire had been an accident, and that he was subsequently told by the official interviewing him that he "should leave the country, because . . . 'You will die of hunger here.'" Petitioner stated that this was his second visit to the Presidential Palace and that "[i]t is commonly known that the third time you are called in, you can be 'disappeared' or killed." Shortly thereafter, petitioner left the country.

At a December 12, 1995 hearing, petitioner testified through an interpreter about his alleged persecution and submitted certain documentary corroboration into evidence. That corroboration consisted of the first page of the minutes of a September 4, 1984 ASTRAPORT meeting, which indicated that petitioner was relinquishing his position as treasurer of the union, and a variety of background documentation, including reports of human rights organizations and newspaper articles that described, among other things, the Guatemalan military's hostility towards, and violent actions against, union leaders and members of the University of San Carlos.

On cross-examination, the INS attorney randomly selected dates from the Affidavit and asked petitioner what he was doing on those dates. After petitioner had answered several such questions in a manner that made it clear to the IJ that the interpreter was not giving petitioner accurate translations of the dates contained in the attorney's questions, the IJ admonished the translator: "Please pay attention to the dates." Notwithstanding the uncertainty thereby created about the accuracy of petitioner's responses in which he agreed when asked whether something occurred on a particular date, the IJ and BIA subsequently attached a high degree of significance to inconsistencies in dates suggested by petitioner's responses to such questions.

In an oral decision issued at the end of the hearing, the IJ made an "adverse credibility" finding with respect to petitioner's testimony based on "inconsistencies between the respondent's [original unamended] application for political asylum and his testimony" and the fact that petitioner "could not remember what had happened to him on certain dates that he had referred to in his affidavit." The IJ thus concluded that petitioner had "failed to produce credible, consistent and sufficient evidence to establish that he has suffered past persecution in his country of nationality or that he has a well-founded fear of persecution."

In a July 21, 1998 decision, the BIA explicitly rejected the grounds for the IJ's adverse credibility finding, noting that

while the IJ had "found the respondent not to be credible based on discrepancies between the respondent's asylum application completed by his first attorney and his testimony at the asylum hearing," petitioner had "adequately addressed these discrepancies on appeal." Nevertheless, the BIA identified different defects in petitioner's testimony and evidence that the BIA believed demonstrated that petitioner had failed to meet his burden of "proving by sufficiently consistent, detailed, unembellished, and plausible testimony that he suffered past persecution or that he has a well-founded fear of persecution."

In overview, the BIA identified the following defects:

(1) a lack of plausibility that petitioner's "brief and minimal" union activity in 1984 would have resulted in his being persecuted into the 1990s;

(2) three discrepancies between petitioner's hearing testimony and the Affidavit (two involving dates of events and one concerning the number of times he was summoned to the Presidential Palace);

(3) "vague" testimony about petitioner's union activities;

(4) a failure to provide adequate documentary corroboration;

(5) embellishment of petitioner's account of his termination from the wood refinery; and

(6) a lack of plausibility that petitioner could have been blacklisted when he was able to obtain employment at the University of San Carlos and the wood refinery.

Based on these alleged defects in the record, which will be discussed more fully below, the BIA denied petitioner's applications for asylum and withholding of deportation. Petitioner timely filed a petition for review by this Court.

## DISCUSSION

### I. Relevant Standards

#### A. Standard of Review

■ On appeal from a decision of the BIA, "[w]e review the factual findings underlying the BIA's determination that an alien has failed to sustain his or her burden of proof to qualify for asylum or withholding of deportation under the substantial evidence standard." *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000). The substantial evidence test accords "substantial deference to the BIA's findings of fact," *Abankwah v. INS,* 185 F.3d 18, 23 (2d Cir.1999), and we will reverse "only if no reasonable fact-finder could have failed to find the past persecution or fear of future persecution necessary to sustain the petitioner's burden." *Diallo,* 232 F.3d at 287. Substantial evidence, however, is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Melgar de Torres v. Reno,* 191 F.3d 307, 312–13 (2d Cir.1999) (internal quotation marks omitted).

■■ However, "when the situation presented is the BIA's application of legal principles to undisputed facts, rather than its underlying determination of those facts or its interpretation of its governing statutes, our review of the BIA's asylum and withholding of deportation determinations is *de novo.*" *Diallo,* 232 F.3d at 287 (internal quotation marks omitted). Thus, for example, in evaluating the BIA's finding here that petitioner failed to provide adequate documentary corroboration for his claim, we review *de novo* the question of whether the BIA properly applied its standard for determining when such additional corroboration is required. *See Diallo,* 232 F.3d at 288.

B. *Granting of Applications for Asylum and Withholding of Deportation*

■ To demonstrate eligibility for asylum, an applicant must generally show that he or she has "a well-founded fear of future persecution" on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.13(b) (2000); *see also Abankwah*, 185 F.3d at 22. However, when "an asylum applicant has demonstrated that [he or] she has been subjected to past persecution, there is a [rebuttable] presumption that a well-founded fear of persecution exists." *Melgar de Torres*, 191 F.3d at 311; 8 C.F.R. § 208.13(b). Even if an applicant succeeds in demonstrating "eligibility for asylum, however, the decision whether to grant a particular application is still within the discretion of the Attorney General." *Diallo*, 232 F.3d at 284 (internal quotation marks omitted).

■ To demonstrate eligibility for withholding of deportation, a showing that then *requires*, rather than merely allows, the Attorney General to grant the application, an applicant must meet a higher burden. *Diallo*, 232 F.3d at 284. The applicant must "establish a clear probability that his life or freedom would be threatened in [a] country on account of" race, religion, nationality, membership in a particular social group, or political opinion. *Id.* at 284–85 (internal quotation marks omitted). In a manner similar to the asylum inquiry, however, if an applicant shows that he has suffered past persecution such that his "life or freedom was threatened," this "clear probability" is presumed unless rebutted by the government by a preponderance of the evidence. *Id.*

II. *The BIA Opinion*

■ The BIA Opinion suffers from at least three serious flaws that require a remand of the opinion: 1) its erroneous conclusion that petitioner was claiming to have been persecuted for eleven years based solely upon his union activities in 1984, a conclusion that underlay the BIA's analysis of several of the defects it identified; 2) its inaccurate characterization of one portion of petitioner's testimony as "vague"; and 3) the BIA's failure to properly apply its own standard in determining that petitioner had not supplied adequate documentary corroboration for his claim.

A. *Activities For Which Petitioner Was Persecuted*

A fundamental flaw in the BIA Opinion is its finding that it was implausible for petitioner to have suffered the persecution he claimed because of the nature and duration of the activities claimed to have triggered that persecution. The BIA reasoned as follows:

> [Petitioner] testified that his union activities began sometime in 1984 and by September 1984 he and other board members had been replaced with new union members (Tr. at 20, 23). As noted above, his only activity on behalf of the union appears to be serving as treasurer and writing the union bylaws. Yet *he claims to have experienced continued governmental interest from this brief and minimal union activity as late as 1995, nearly 11 years later.*

(Emphasis added). The italicized statement by the BIA—that petitioner was claiming to have been persecuted based solely on his "brief and minimal" union activity in 1984—is patently erroneous, and reflects the failure of the BIA Opinion as a whole to recognize or address the other two grounds that petitioner claimed were also responsible for his continued persecution. These grounds were his subsequent employment in 1985 and 1986 at the University of San Carlos, the faculty

and staff of which undisputedly have been targets of military violence and hostility in Guatemala, and petitioner's friendship beginning approximately in 1990 with a guerilla leader who was killed by the military in 1992. These events were not only described in the Affidavit and supported by background documentary evidence (described more fully *infra*), but were also the clear and undisputed subject of petitioner's hearing testimony. (*See* Tr. at 30–38). Thus, whether petitioner's claim would have been plausible if it had, in fact, been based solely on his months as a union officer is irrelevant here, because petitioner has made a much more extensive claim.

Furthermore, the effects of this error extend beyond this finding of implausibility. As explained below, this exclusive focus on petitioner's union activity in 1984 also affects certain of the BIA's findings concerning inconsistencies.

### B. *Inconsistencies*

The BIA noted three inconsistencies between the Affidavit and petitioner's testimony. Among these were discrepancies concerning the date on which petitioner was ousted from the ASTRAPORT union and the date on which he was placed under house arrest:

> We further note the discrepancies between the dates provided by the respondent in his sworn affidavit and during his testimony. In his affidavit, he claimed that he was ousted from the union board in September 1984 and that he was placed under house arrest in September 1984. During his testimony, however, he claimed that he was ousted in late 1984 or early 1985 (Tr. at 23–25).

He failed to mention on direct examination his house arrest, and when questioned on cross-examination he claimed that he was placed under house arrest in late 1984 or early 1985.

Because the BIA Opinion mistakenly assumed that petitioner's period of "brief and minimal" union activity in 1984 was the sole activity provoking years of persecution, it attaches undue weight to any appearance of inconsistency in petitioner's December 1995 hearing testimony about that time period. Even assuming petitioner's testimony was viewed by the BIA as varying from the Affidavit by the largest margin of four or five months (September 1984–January/February 1985), it remains the case that evaluating the significance of such discrepancies when they appear in an applicant's description of what is thought to be the sole key time period—itself only months in duration—is necessarily a different process than evaluating their significance in the context of an account spanning more than eight years containing multiple key time periods. To use a more basic example, one might easily and quickly characterize a person shopping for groceries as "forgetful" if, after being instructed to buy four specific grocery items, he or she failed to purchase one and got the wrong brand of another; on the other hand, the evaluation of a person making the same errors after an instruction to purchase twenty specific items would almost certainly not be the same. Thus, a re-evaluation of the significance of these two inconsistencies identified by the BIA in the proper context of petitioner's complete account of his alleged persecution[3] is

3. The third inconsistency identified by the BIA does not relate to the time period at issue and thus need not be re-evaluated in the same manner, although, as discussed more fully in Part III, *infra*, it may be examined again as part of the reassessment of petitioner's claim on remand. That inconsistency concerns petitioner's statement in his Affidavit that the military had summoned him to the Presidential Palace twice and that particularly dangerous consequences could result from a third summons, as contrasted with his hearing tes-

required.[4]

### C. *Vagueness*

The BIA Opinion continues:

[W]e observe that the respondent's testimony regarding his activities as the union treasurer was vague. The only activity to which he testified was the writing of the union's bylaws along with the other union board members (Tr. at 20). We find this lack of detailed testimony particularly troubling because the respondent's union activities serve as the claimed source of the government's interest in him. . . .

Although this conclusion would at a minimum need to be re-evaluated due to the BIA's reliance on the same erroneous premise that petitioner's union activities were claimed to be the sole basis for his persecution, the BIA's vagueness finding suffers from a more substantial problem.

While the period in which petitioner claimed to have engaged in union activity was certainly somewhat brief, a full account of that brief period does not constitute "vague" testimony. Our review of the record makes clear that the BIA's characterization of petitioner's account of his un-

ion activities as "vague" is not supported by substantial evidence.

At the December 1995 hearing, petitioner testified that he and others in his company decided in the early 1980s to form a union "[t]o see that everything would get better and also the life of the workers would improve." Petitioner explained that, to carry out this plan, he participated in a local training program on union organizing, along with twenty other people from different departments in his company. He explained that he and the others formed the ASTRAPORT union in 1984, and that he served as treasurer of the union. As the BIA noted, petitioner then participated with other members of the union board in the writing of the union's by-laws.

Petitioner further testified that, immediately after the by-laws were approved, the members of the union board were removed by order of the government in anticipation of an upcoming national election:

Q: Why did they put others in your place?

A: There were orders from the boss of the—there were orders coming from the boss.

---

timony which suggested that he had, in fact, been brought to the palace more than two times.

4. We also note that, in connection with petitioner's somewhat ambiguous testimony regarding the date he was ousted from the union, the BIA Opinion contains what is either two different interpretations of the same portion of petitioner's testimony or else a mistake. Specifically, petitioner testified at the December 1995 hearing that he was fired from his job at the company at "the end of 1984 or kind of at the beginning of 1985"— the Affidavit was silent on whether petitioner had been fired from the company at the same time as, or after, the September 1984 ouster from the union—then agreed with his representative's characterization of his removal from the union as having occurred at "the

same time" as the firing. Referring to petitioner's testimony on this subject, the BIA stated in one part of its opinion that petitioner *"testified* that his union activities began sometime in 1984 *and by September 1984 he and other board members had been replaced* with new union members (*Tr. at 20, 23)."* (Emphasis added). However, just two paragraphs earlier, when scrutinizing petitioner's testimony for inconsistencies, the BIA claimed that petitioner's agreement with his representative's characterization of the union ouster as occurring at "the same time" as his being fired from the company was actually inconsistent with the September 1984 date: "During [petitioner's] testimony . . . he claimed that he was ousted in late 1984 or early 1985 (Tr. at 23–25)." On remand, the BIA should correct or explain this discrepancy.

Q: Was anyone ordering the boss to do this?

A: Yes, the president of the Republic.

Q: Why was he ordering the governing board be taken out?

A: Because that was the year that the elections were coming and that happened at a national level.

Q: Why did they want to take out the union officers before the elections?

A: To give the—the person that was coming from the official party would have the triumph, would succeed.

Q: Did the president think that the union officers were going to help him or hurt him?

A: The situation was that when they took us away, they put other people that would help the government.

Q: Did the president believe that you were not going to help the government?

A: That was the idea.

(Tr. at 23–24). Finally, petitioner explained that union officials in every company that was "depending on the state and that was semi-autonomous" were also removed from their jobs at that time, and that "[t]he ones that did not want to leave or that would stand up for themselves were kidnapped, were put in prison, or they disappeared."

■ The BIA has not identified a particular time period in which petitioner has not fully described his union activity, nor what details it would have expected petitioner to provide that he did not. Based on the specific details provided in petitioner's testimony as noted above, we find that the BIA's conclusion that petitioner's testimony regarding his union activities was vague is not supported by substantial evidence. *See Diallo*, 232 F.3d at 287 (court rejects, as unable to "withstand even deferential review," IJ's and BIA's finding that peti-

tioner had " 'not offered ... specific, credible detail about' his experiences"; court holds that "[o]n the record before us, we think the IJ was plainly in error to find that Diallo failed to provide 'specific, credible detail' in his testimony"). The BIA may not rely on this characterization on remand.

### D. *Documentary Corroboration*

The BIA also held that petitioner had failed to support his application with sufficient corroborative documentary evidence:

> The only corroboration the respondent has provided, other than the generalized background material, is a copy of the minutes of one of the union meetings. This absence of relevant corroborating evidence is not adequately explained, particularly given his recent communication with his wife who continues to live in Guatemala (Tr. at 44).

In *Diallo v. INS*, 232 F.3d 279 (2d Cir. 2000), decided after the oral argument in this case, we agreed with the BIA that in determining whether an applicant has met his or her burden of proof, "corroborating evidence (or an explanation for its absence) may be required if it would reasonably be expected." *Id.* at 290. We explained that

> [c]orroboration in this context typically includes both evidence of general country conditions and evidence that substantiates the applicant's particular claims. *The BIA has repeatedly emphasized the importance of providing background evidence concerning general country conditions, especially where it tends to confirm the specific details of the applicant's personal experience.*

*Id.* at 288 (emphasis added). As for more specific documentary corroboration of the details of an applicant's claim, we noted that "[a]ccording to the BIA, specific documentary corroboration is required only for

'material facts which are central to [the applicant's] claim and easily subject to verification, such as evidence of his or her place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment.' " *Id.* (quoting *In re S–M–J–,* Int. Dec. No. 3303, 1997 WL 80984, 1997 BIA LEXIS 3, at *9 (Jan. 31, 1997)).

In light of these standards, we vacated and remanded the BIA decision primarily because: 1) Diallo had presented ample general background evidence that closely paralleled his personal experience of persecution, and, 2) although the BIA had identified four types of specific documentary corroboration that Diallo had failed to provide, we did not see why, nor did the BIA explain why, "it was reasonable to expect additional corroboration beyond the materials supplied by" Diallo. *Id.* at 288.

 The BIA's finding here regarding corroboration is likewise inconsistent with its standards. First, the BIA erroneously downplayed the significance of petitioner's "generalized background material." Petitioner's background materials contained, among other things, information regarding the persecution by the military of both members of unions and members of the University of San Carlos.[5] An Americas

Watch report detailing the history of the persecution of members of the University of San Carlos specifically discusses the military's brief takeover and occupation of the University in early September 1985, which was also described by petitioner in the Affidavit and in his hearing testimony. In addition, the newspaper articles introduced by petitioner included reports of the killing of guerrilla leader Efrain Bamaca Velasquez, the man petitioner allegedly befriended in the time leading up to his being fired from the wood refinery.[6] Here, as in *Diallo,* "[petitioner's] description of his personal experiences closely parallels the patterns of persecution ... chronicled in these sources." *Diallo,* 232 F.3d at 288.

As for more specific corroboration of petitioner's personal experiences, the BIA here did not identify any particular document or type of document it believed to be missing from the record (as it did in *Diallo*), much less explain why it would have been "reasonable to expect the provision of such materials under its own standards." *Id.* at 289. This not only represents the BIA's failure to properly apply its own standard, but also deprived petitioner of the potential opportunity, if the BIA identified certain reasonably expected documents, to meet his burden of proof "by

---

**5.** The U.S. Department of State report on Guatemala in 1995 noted that "Guatemalan universities often have been centers of opposition to the government and, in some instances, bases for pro-guerrilla activity. There has been considerable violence at universities, including a violent confrontation with police at San Carlos University in Guatemala City on November 11, 1994, that resulted in the death of one student." Another report from the human rights organization Americas Watch commented on the "unique role the USAC [University of San Carlos] has played in Guatemalan political life" and stated that "[t]he USAC has officially been autonomous from the government since 1944," making it a "singular haven for political opposition." A subsequent Americas Watch report discussing the

situation in Guatemala from November 1988–February 1990 further described that:

> [b]eginning in August 1989, the University of San Carlos (USAC) community in Guatemala City—long targeted by the military under earlier regimes—was hit by a wave of killings and disappearances. Since August 9, fourteen members of the university community have been abducted. As of February 1990, six had been found dead, five remain disappeared, and three have been released.

**6.** A March 25, 1995 New York Times newspaper article submitted to the BIA reports that he was killed "some weeks after he was taken prisoner in March 1992."

offering a believable and sufficient explanation as to why such corroborating evidence was not presented." *Id.* at 288–89.

Moreover, the "copy of the minutes of one of the union meetings" referenced in the BIA Opinion actually provided far more corroboration than the BIA's general description suggests. The minutes specifically identified petitioner as the treasurer of the ASTRAPORT union and documented the events taking place on the date of those minutes, September 4, 1984—petitioner's removal from his union position. The document thus directly supports petitioner's account of his activities in the time period focused on by the BIA—petitioner's "brief and minimal" union activity in 1984. *See Diallo,* 232 F.3d at 288 (quoting BIA opinion identifying "evidence of publicly held office" as example of specific documentary corroboration that may be required).

### III. *Remand*

On remand, the BIA should consider petitioner's claim in accordance with the preceding discussion. In light of the remand, we also encourage the BIA to reexamine its conclusions that petitioner embellished his account of his termination from the wood refinery and that petitioner's claim that he was blacklisted was implausible.

As to the former, the BIA claimed that the Affidavit "stated the owner of the wood refinery told him that he was being fired because of his 'problems with the army,'" while petitioner's testimony was that "an army officer visited the wood refinery and told him that he should leave the country because of his union activities and because

of his friendship with an internationally-recognized guerrilla leader." We note, however, that the BIA appears to have misread the hearing transcript when it described petitioner as testifying that an army officer told him he should leave Guatemala; petitioner actually testified that the army officer "advised me that it was better for me to leave the *company,*" *i.e.,* the wood refinery, not that he was told he should "leave the *country*" as the BIA Opinion claims. In addition, the involvement of an army officer in petitioner's termination was mentioned in the Affidavit as well as petitioner's testimony, and while petitioner did not specifically testify about the owner of the wood refinery telling him he had "problems with the army," he did testify that the army officer told him he should leave the company because of certain of those problems, namely "[b]ecause of the previous events that I had with the union and because of my friendship with the guerrilla guy." *See Aguilera–Cota v. INS,* 914 F.2d 1375, 1382 (9th Cir.1990) (rejecting as basis for adverse credibility finding the fact that petitioner's "oral testimony included information not set forth in his asylum application" where such information did not contradict the application).

As for petitioner's claim of blacklisting, which the BIA also found implausible,[7] we note that the BIA does not appear to have considered the special nature of the two jobs petitioner was actually able to obtain. As described in petitioner's brief, and as petitioner's testimony communicated and his general background material confirmed, the University of San Carlos "functioned as an oasis in a society generally controlled by the army." As for the wood

---

7. The BIA Opinion stated: "[Petitioner] also claimed that he was unable to obtain employment because he was 'blacklisted' by the government, yet he was able to work for the University of San Carlos for nearly 2 years despite the army's knowledge of his employment there (Tr. at 29–32). He was also aole to work at the wood refinery for nearly 2 years (Tr. at 34–35)."

refinery job, petitioner testified that the job involved working in the jungle 800 kilometers (approximately 500 miles) from the capital of Guatemala. His testimony suggests that monitoring by the army in that area was somewhat more limited than in the capital, because he claims that he managed to work there undetected for almost two years before his identity was discovered and he was fired. These jobs thus arguably appear to be of the sort that would have been available to a blacklisted person.

■ To the extent that the BIA determines on remand to accord significance to any inconsistencies, we encourage the BIA to consider providing some means for petitioner to offer an explanation for them. *See Abovian v. INS*, 219 F.3d 972, 979 (9th Cir.2000) (plausible explanation may suffice to overcome minor inconsistencies). We note that, on appeal to the BIA, petitioner was able to explain to the BIA's satisfaction the inconsistencies relied upon by the IJ, but was not provided the same opportunity to address the items raised *sua sponte* in the BIA Opinion due to the BIA's denial of petitioner's request for oral argument of the appeal.

■ Even if it does not provide petitioner the opportunity to explain the inconsistencies, however, we remind the BIA that the mere existence of inconsistencies in the record should not automatically be deemed fatal to an applicant's claim. In *Diallo*, we noted the existence of certain inconsistencies in the petitioner's story concerning his place of birth and residence, a six-month discrepancy between "his application [which] list[ed] December 1989 as the date of his arrest" and his testimony "that soldiers came to his house and arrested him in June 1990," and "other inconsistencies concerning the amount of time he spent both in prison and in the refugee camp." *Diallo*, 232 F.3d at 288.

Nevertheless, in remanding the case to allow the BIA to remedy its failure to make an explicit credibility finding, we cautioned that "[w]here an applicant's testimony is generally consistent, rational and believable, disparities like the ones listed above need not be fatal to credibility, especially if the errors are relatively minor and isolated." *Id.* The same standard should be applied here.

## CONCLUSION

For the foregoing reasons, the judgment of the BIA is VACATED and REMANDED for further proceedings consistent with this opinion.