United States Court of Appeals
Fifth Circuit

**F I L E D**

August 5, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-60185

ERNAD BEGANOVIC; SAFETA BEGANOVIC; JASMIN BEGANOVIC

Petitioners,

VERSUS

JOHN ASHCROFT, U.S. ATTORNEY GENERAL

Respondent.

Petition For Review of an Order
of the Board of Immigration Appeals
(A76 433 107)

Before BENAVIDES, STEWART and DENNIS Circuit Judges.
PER CURIAM:[*]

Petitioner Ernad Beganovic, his wife Safeta, and his son Yasmin challenge the Board of Immigration's ("BIA") affirmance of the Immigration Judge's ("IJ") denial of asylum. After carefully reviewing the record, we deny the petition for review.

**I.   Background**

In August 1997, the Beganovics, Albanians from Kosovo,

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

Serbia-Montenegro, entered the United States on visitors' visas. Six months later, the INS served them notice to appear charging them as eligible for deportation for overstaying their visas. The Beganovics then filed an asylum application.

In the asylum application, Ernad claimed that he was subject to both past and future persecution due to his participation in political activities with the Democratic Action Party ("PDA"), and Democratic League of Kosovo ("LDK"). Ernad alleged mistreatment or harassment by the Serbian police on five separate occasions because of his political affiliation with those groups. In sum, the allegations of fact in the asylum application are as follows:

A.  *First Incident*

In October 1991, in his hometown of Pec, Ernad joined the SDA, a secular party that advocated for the right of Albanians in Kosovo as well as other Muslims throughout then-Yugoslavia. A month later, a Serbian police officer arrested Ernad while Ernad was hanging posters with some friends. The officer confiscated the posters and took Ernad and his friends to the police station for questioning. The young men were roughly treated by the police and Ernad claims that he was beaten for roughly half an hour. When the officers were finished asking questions, Ernad asked for the return of his posters. In response, an officer punched Ernad in the face and stomach and threatened worse if he caught Ernad again.

2

**B.** *Second Incident*

In April 1992, Serbian police officers stepped up their harassment of party members and arrested SDA's regional president, Balic. Balic was jailed for two days and was allegedly beaten. In response to Balic's arrest and the increasing police harassment of party members, the SDA was disbanded and Balic fled the country.

**C.** *Third Incident*

In 1994, after marrying Safeta and fathering Yasmin, Ernad joined LDK. He worked frequently for the party and became a editorial writer for its newsletter. In the middle of the night on February 3, 1996, Beganovic heard pounding on the door by three men he suspected were police officers though the men wore no uniform. When Ernad opened the door, one of the men, who was armed, attacked him and began to beat him. The man put his foot on Ernad to hold him down and at times dropped to his knee to punch Ernad in the face. The other two men ransacked the apartment, yelling, "Where are your guns? Where are your friends? Where's your damned paper?" One of the men threatened to throw Safeta and Yasmin off of the apartment's balcony if she and Yasmin did not quit screaming. After beating Ernad sufficiently enough to leave welts and bruises on his body and destroying most of the Beganovics' possessions in the apartment, the men left.

**D.** *Fourth Incident*

3

In June of 1996, four uniformed officers came to Ernad's apartment and took him to the police station. The police questioned Ernad about LDK and its officers. When Ernad did not give the officers any specific information, he was taken into a dark room and beaten until he was unconscious. Ernad awoke and was questioned a second time. After Ernad refused to sign a piece of paper upon which he could not see what was written, Ernad was again taken into the dark room and beaten until unconscious. Ernad awoke near his apartment door on the 11th floor, but could not recall how he got there. He knocked on the door and his wife Safeta helped him inside. The Beganovics then abandoned their home to live with Ernad's parents who lived nearby.

**E. Fifth Incident**

Seven months later, in January 1997, while Ernad was out with a friend, the police came looking for him at his parents' home. His wife testified that the officers had a menacing tone and when informed that Ernad wasn't there, said "We'll find him." After this incident, the Beganovics moved to Novi Sad, and in August 1997, they fled to the United States.

**F.  The Hearing and the IJ's decision**

At the two-day asylum hearing before the IJ, the Beganovics had five people testify in support of the asylum petition. They

were: (1) Ernad; (2) Safeta; (3) Professor Reinhartz, a history professor at University of Texas-Arlington; (4) Benin Sucheere, one of Safeta's cousins, and (5) Dennis Mala, an acquaintance of Ernad's from Kosovo. After the hearing, the IJ concluded that the Beganovics had not carried their burden of persuasion on their asylum petition because the testimony of Ernad and Safeta regarding past persecution was incredible. The IJ made an alternative ruling that even if he had found the Beganovics' testimony credible, the five incidents of harassment Ernad suffered did not rise to the level of persecution. Finally, the IJ concluded that because of changed country conditions in Kosovo, even if the five incidents of harassment constituted persecution, the Beganovics failed to establish a well-founded fear of future persecution. Accordingly, the IJ denied all relief, except that he granted the Beganovics' request for voluntary departure.

The Beganovics appealed the IJ's findings to the BIA. The Beganovics also asked to supplement the record with additional material regarding conditions within the country as well as some specific documentary evidence of medical treatment Ernad received as a result of the June 1996 incident and that Ernad was still wanted by the Serbian police. The BIA summarily denied all relief, primarily relying on the adverse credibility determinations made by the IJ. The BIA also denied the motion to supplement the record because the additional materials would not have affected the

5

outcome of the case. The Beganovics timely filed a petition for review with this court challenging both the denial of asylum and the BIA's refusal to grant the Beganovics' motion to supplement the administrative record.

## II. Analysis

"Any alien who is present in the United States or who arrives in the United States,...irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). "The Attorney General may grant asylum to an alien who has applied for asylum...if the Attorney General determines that such alien is a refugee...." *Id.* at § 1158(b)(1). The term "refugee" includes "any person who is outside of any country of such person's nationality...and who is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at § 1101(a)(42)(A). "The applicant may qualify as a refugee because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." *See* 8 C.F.R. § 208.13. It is the alien who bears the burden of proof to show that he is a "refugee" in order to be eligible for a grant of asylum. See 8 C.F.R. § 208.13.

In reviewing BIA decisions, we review factual findings for

substantial evidence and questions of law *de novo*. *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 44 (5th Cir. 2001). "The substantial evidence standard requires only that the BIA's decision be supported by record evidence and be substantially reasonable." *Omagah v. Ashcroft*, 288 F.3d 254, 258 (5th Cir. 2002). We will "accord deference to the BIA's interpretation of immigration statutes unless the record reveals compelling evidence that the BIA's interpretation is incorrect." *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997). "In other words, [an alien] must show that the evidence was so compelling that no reasonable factfinder could conclude against it." *See Efe*, 293 F.3d at 905; 8 U.S.C. §1252(b)(4)(B)("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."). This court only reviews decisions made by the BIA. *See Castillo-Rodriguez v. INS*, 929 F.2d 181, 183 (5th Cir. 1991). Because the BIA summarily adopted the IJ's findings and conclusions in this case, we refer to those findings as incorporated by the BIA decision. *Efe*, 293 F.3d at 903.

The primary basis for the IJ's denial of the Beganovics' asylum petition is that he did not find the Beganovics credible and thus did not find that they carried their burden in proving past persecution. This adverse credibility determination is based on a number of inconsistencies that the IJ observed between the

petitioners' pre-hearing asylum statement, Ernad's hearing testimony, Safeta's hearing testimony, and the Beganovic's failure to present documentary evidence in support of their asylum claim.

It is clear that we give great deference to an immigration judge's decisions concerning an alien's credibility. *Chun v. INS*, 40 F.3d 76, 78 (5th Cir. 1994). In addition, the immigration judge has the duty to judge the credibility of the witnesses and to make findings accordingly. *Vasquez-Mondragon v. INS*, 560 F.2d 1225, 1226 (5th Cir. 1977). Furthermore, this court is simply "not permitted to substitute our judgment for that of the Board or the [Judge] with respect to the credibility of this testimony or the ultimate findings of fact based thereon." *See id.* at 1226 (internal citation omitted).

But the IJ may not completely insulate his findings from our review simply by stating that a petitioner is not credible. *See Anderson v. Bessmer City*, 470 U.S. 564, 575 (citing *Wainwright v. Witt*, 469 U.S. 412 (1985)). We agree with other circuits that the IJ must provide cogent reasons for his credibility determination, *see, e.g., Cordero-Trejo v. INS*, 40 F.3d 482, 487 (1st Cir. 1994); *Alvarado-Carillo v. INS*, 251 F.3d 44, 56 (2d Cir. 2001); *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998); *Mansour v. INS*, 230 F.3d 902, 906-09 (7th Cir. 2000); *Zahedi v. INS*, 222 F.3d 1157, 1165 (9th Cir. 2000), and those reasons must be

8

supported by substantial evidence in the record much like any factual determination. *See Lopez De Jesus v. INS*, 312 F.3d 155,161 (5th Cir. 2002)("a credibility determination may not be overturned unless the record compels it.")

Our review of the IJ's reasons and the record in this case, however, does not compel us to reverse the IJ's adverse credibility determination. Ernad's testimony before the IJ was inconsistent with the first and second incidents of persecution he alleged in his asylum petition. For example, in the first incident, the asylum petition states that Ernad was beaten for a period of 30 minutes during police questioning. But his testimony before the IJ alleges only that he was punched in the stomach once after the end of questioning and only when he asked the police for the posters back. Similarly, the second incident of alleged persecution in the asylum petition makes no mention of Ernad being questioned and released by the Serbian police as he testified before the IJ. Instead, the petition only details the arrest of the SDA's regional president, Balic.

Further, as the IJ noted, the testimony of Ernad and Safeta with regard to the fourth incident in June of 1996 is inconsistent. Ernad never testified that he was hospitalized or that he went to the hospital for outpatient treatment as a result of the police beating. Conversely, Safeta testified first that Ernad was taken

9

by an ambulance to the hospital "for a day or so." Safeta next testified that Ernad had not gone to the hospital until hours later, was released the same day, and that he had been initially treated by an emergency ambulance crew. In light of the inconsistencies, the shifting nature of Safeta's account of who was present at the apartment when the ambulance arrived, and the absence of any reference to an ambulance or hospital visit in the rather detailed asylum petition submitted on the Beganovics's behalf, we cannot conclude that the IJ's adverse credibility determination in this case was not supported by substantial evidence. A reasonable judge could view these inconsistencies as evidence of falsity. See United States v. Jencks, 353 U.S. 657, 667 (1957)("Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.").

Moreover, the IJ stated that his adverse credibility determination was also bolstered by his "observing the respondent closely" while Ernad was testifying and by the lack of any documentation directly in support of Ernad's political activities

10

or his troubles with the Serbian police. While the Beganovics were not required to provide documentary corroboration of the alleged incidents of persecution, the immigration regulations "unambiguously contemplate cases where an applicant's testimony alone will not satisfy his burden of proof." See Sidhu v. INS, 220 F.3d 1085, 1090 (9th Cir. 2000)(citing 8 C.F.R. § 208.13(a)). Though we agree that Ernad initially testified why documentation was not available, *i.e.* the danger of keeping political articles and party membership cards coupled with the difficulty of getting information from Serbian officials, that initial testimony was undercut by his later testimony in which he stated that civil unrest prevented him from providing any documentary corroboration.

Ultimately, we cannot find a compelling reason in the record to reverse the IJ's adverse credibility determination and the IJ's concomitant determination that the Beganovics had not carried their burden of proving past persecution necessary to warrant a grant of asylum. Accordingly, we need not consider whether the IJ's alternative rulings withstand our scrutiny. The petition for review is DENIED.

**PETITION DENIED**

11