United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 11, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-60905
Summary Calendar

MARTHE BENYI KABAMBA, EDO JOEL LUSAMBA KABAMBA, BENY
CATHY MARLENE KABAMBA, JULES NGOLE KABAMBA, and
CHRISTAIN TENDAYI KABAMBA

Petitioners,

versus

ALBERTO R. GONZALES, UNITED STATES ATTORNEY GENERAL

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before REAVLEY, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Petitioners, an ethnic Tutsi mother and her four children who are natives and

citizens of the Democratic Republic of the Congo ("DRC"), petition for review of an

order of the Board of Immigration Appeals ("BIA") denying their application for asylum,

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

withholding of removal, and protection under the Convention Against Torture.  Because the credibility determination of the Immigration Judge ("IJ") is not supported by the record, we grant the petition and remand to the BIA for further consideration.

1.    When, as in this case, the BIA affirms without opinion the IJ's decision, this Court reviews the IJ's decision.  Soadjede v. Ashcroft, 324 F.3d 830, 831-32 (5th Cir. 2003).  We use the substantial evidence standard to review the IJ's factual conclusion that an alien is not eligible for asylum, withholding of removal, and relief under the Convention Against Torture.  Zhang v. Gonzales, ___ F.3d ___, 2005 WL 3214455, at *2 (5th Cir. Dec. 1, 2005).  The agency's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.  Id. (citing 8 U.S.C. § 1252(b)(4)(B) and  INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815 (1992)).  Under this standard, reversal is improper unless we decide "not only that the evidence supports a contrary conclusion, but also that the evidence compels it."  Zhao v. Gonzales, 404 F.3d 295, 306 (5th Cir. 2005) (quoting Chun v. INS, 40 F.3d 76, 78 (5th Cir.1994)).

"[I]t is the factfinder's duty to make determinations based on the credibility of the witnesses."  Id.; see also Mantell v. INS, 798 F.2d 124, 127 (5th Cir. 1986) ("We will not review decisions turning purely on the immigration judge's assessment of the alien petitioner's credibility.").

2

However, we agree with the Ninth Circuit that an IJ's conclusion that a petitioner is not credible may not be accepted "blindly." Aguilera-Costa v. INS, 914 F.2d 1375, 1381 (9th Cir. 1990). An adverse credibility determination still must be supported by specific and cogent reasons derived from the record. Zhang, ___ F.3d ___, 2005 WL 3214455, at *2 (citations committed). In this case, we conclude that the IJ's credibility determination regarding lead petitioner, Marthe Kabamba, is not supported by substantial evidence in the record.

2.    Mrs. Kabamba testified that her husband served in the former Mobutu government for a period of years preceding the ascension of President Laurent Kabila. Mrs. Kabamba stated that, at the hands of the Laurent Kabila regime, she and her husband were robbed, beaten and tortured, that her brother-in-law was killed and her sister-in-law raped, and that she herself was also brutally raped, requiring hospitalization for an extended period of time.

Mrs. Kabamba also testified that she was incarcerated, interrogated, and beaten at least twice following the assassination of Laurent Kabila and ascension to power of his son, Joseph Kabila, in 2001, the latter beating incident resulting again in a documented hospitalization for Mrs. Kabamba. She has not seen her husband since she was released from the hospital and does not know his whereabouts. Witness testimony corroborated these

3

atrocities against the Kabamba family as commonly-known and widely publicized at the time. As the IJ acknowledged, Mrs. Kabamba's testimony regarding these incidents has remained internally consistent throughout the application process. The IJ, who raised no question of veracity based on Mrs. Kabamba's demeanor,[1] discounts her credibility on three bases:

3. First, the IJ focused on the fact that Mrs. Kabamba used the address of her old family home on her application for asylum, but testified that she spent a period of around eighteen months moving from house to house of friends after the initial incident of violence in 1997, and that she spent five or six months living with various friends after the second incident of violence in 2001. Mrs. Kabamba explains that she did not know the specific addresses of the various friends with whom she had stayed during fearful periods and considered the old family home the appropriate address for application purposes. Further, her application also mentions that she was forced to abandon her home and live clandestinely with friends on the same two occasions to which she testified at the hearing.

The BIA has stated that it will generally defer to an IJ's adverse credibility finding based on inconsistencies regarding events central to an

---

[1] The First Circuit has held that credibility findings of an IJ that rest on analysis of testimony rather than on demeanor may deserve less than usual deference. Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994).

alien's asylum claim if the record reveals that (1) the discrepancies and omissions described by the IJ are actually present in the record; (2) such discrepancies and omissions provide specific and cogent reasons to conclude that the alien has provided incredible testimony; and (3) the alien has failed to provide a convincing explanation for the discrepancies and omissions. In re S-A-, Interim Decision 3433 (BIA June 27, 2000). The inconsistency perceived by the IJ related to the address listed on the application does not go to the heart of the Kabamba's claim. When asked to proved an explanation for the seeming inconsistency, Mrs. Kabamba did so. The fact that Mrs. Kabamba offered her old family home as her official address, but explained in both her testimony and in her application that she was, at times, living in different locations does not constitute the kind of inconsistency that could be considered so cogent as to justify an adverse credibility finding.

The IJ placed additional emphasis on the perceived inconsistency regarding the family residence based on the testimony of Mrs. Kabamba's oldest son Alain (also known as Elan). However, Alain Kabamba, who's testimony was marred by evasive answers and a lack of respect for the proceedings, was himself deemed incredible by the IJ and the Government. The IJ selected as credible the lone contradictory statement that Alain made regarding his mother's testimony as to her continued residence in the family

5

home during a relevant period. By both the IJ's and the Government's own measure, the testimony of Alain Kabamba lacked sufficient indicia of reliability to draw an adverse credibility finding. The IJ's use of Alain's testimony to impeach Mrs. Kabamba's credibility is not supported by the record.[2]

4.    Second, the IJ complained that the non-testimonial evidence provided by Mrs. Kabamba relating to her husband's precise position in the Mobutu regime was scant. Mrs. Kabamba provided (a) a presidential order signed by President Mobutu, appointing the members of his cabinet and listing Mr. Kabamba as "Minister of Decentralization," (b) a BBC article discussing the above-referenced cabinet appointments and mentioning Mr. Kabamba by name as "Minister of Decentralisation," (c) a certificate issued to Mr. Kabamba following successful conclusion of a political training program during the Mobutu regime, and (d) various photos of Mr. Kabamba with President Mobutu, either alone or with other government officials. Mrs. Kabamba also provided the testimony of two witnesses living in the United States, who corroborated her claim that Mr. Kabamba was well-known in

---

[2] We note that Alain Kabamba has already been granted asylum in a prior proceeding, apparently on facts much less compelling than those his mother presents here. Despite the IJ's open disdain for that decision, it cannot be altered in this proceeding and should not prejudice the current petitioners.

Kinshasa as a ranking member of the deposed Mobutu regime. The IJ did not specify what additional documentation would have satisfied him.

The BIA has held that corroborating documentary evidence, although not essential to establish a claim, 8 C.F.R. 208.13(a), should be produced where it its reasonable to expect it or an explanation should be produced as to why it was not presented. Matter of S-M-J, 21 I&N Dec. 722, 725-26 (BIA 1997).[3] The Third Circuit has held that the requirement that an adjudicator support his or her demand for corroborative evidence with a reasoned explanation that conforms to the actual conditions in the applicant's former country or residence "constitutes one small, but crucial, defense against potentially mistaken, culturally based assumptions about the existence and availability of documents." Mulanga v. Ashcroft, 349 F.3d 123, 134 (3d Cir. 2003) (reviewing denial of asylum to a native and citizen of the Congo).

Mrs. Kabamba testified that her husband served in a now-deposed

---

[3] See also Alvarado-Carillo v. INS, 251 F.3d 44, 53-55 (2d Cir. 2001) (reversing BIA denial of asylum where generalized information that was submitted provided support for claim and where the BIA failed to identify any particular document or type of document it believed was missing); Guo v. Ashcroft, 361 F.3d 1194, 1200-02 (9th Cir. 2004) (holding that, when applicant's credibility is in question, corroborative evidence should be produced but only where it is "easily available" and that it is inappropriate to make an adverse credibility finding for failure to produce affidavits from relatives or acquaintances living outside the United States); Unase v. Ashcroft, 349 F.3d 1039, 1043-45 (7th Cir. 2003) (reversing denial of asylum where undue weight was given to lack of corroborating testimony).

7

regime. She testified that she was forcibly taken from her home by government agents and that her home was ransacked by military forces and abandoned for a long period of time, during which additional political upheaval ensued. Mrs. Kabamba has been in the United States since 2002. Given the circumstances, it is quite reasonable that it became difficult for her, or for anyone on her behalf, to find relevant governmental documentation beyond that which she supplied. Additionally, imputed political affiliation is only one basis for Mrs. Kabamba's fear of future persecution – she and her children are also ethnic Tutsi who, as the record reflects, remained at risk in the DRC at the time of the hearing. Given the country conditions and the particular circumstances, it is unreasonable to require Mrs. Kabamba to provide further corroborating documentation of her husband's political party affiliation. The IJ's adverse credibility determination based upon lack of additional unspecified and difficult-to-obtain corroborative documents was not supported by substantial evidence.

4. Third, the IJ found troublesome the fact that, after the initial attack in 1997, Mrs. Kabamba returned to the Congo on more than one occasion after trips to the United States. The IJ noted that Mrs. Kabamba was able to get her passport renewed, secure exit visas, and, "with apparently relative freedom," leave the country in spite of her persecution by government officials. The IJ was also apparently troubled because he found it

8

improbable that she would leave her children in the United States while traveling back to the DRC.

Mrs. Kabamba asserts that she was deeply attached to her country — she had no job in the United States and spoke no English — and that she was hopeful in her belief in the assurances of the second Kabila regime that change toward supporters of the Mobutu regime and toward ethnic Tutsis was forthcoming. Upon her realization that nothing was going to change and that she and her children would not be safe in her native country, she applied for asylum.

Apparent inconsistencies in treatment by various government officials provide an insufficient basis to deny asylum where a person has suffered persecution at the hands of some such officials. See Matter of Pula, 19 I&N Dec. 467, 472 (BIA 1987) superceded in non-relevant part by regulation as stated in Andriasian v. INS, 180 F.3d 1033, 1043-44 (9th Cir. 1999), see also Popova v. INS, 273 F.3d 1251, 1258-59 (9th Cir. 2001) (holding that because a person was allowed to work for the government and to travel does not mean she was not persecuted); Lopez-Galarza v. INS, 99 F.3d 954 (9th Cir. 1996) (holding that, where applicant was released after being raped and abused in prison, evidence that someone was persecuted and released cannot be used to infer that the person does not have a well-founded fear of persecution).

9

In this case, Mrs. Kabamba consistently testified that the reason she returned to the DRC after previous trips to the United States was because there were governmental promises and hope of change. She consistently testified that she believed the animosity toward members of the former government and the Tutsi tribe was incidental to the overthrowing of the Mobutu regime, but not the result of ongoing governmental policy. She initially trusted the new government's public declarations of its commitment to the democratization of the DRC and was convinced that things would get better after the new government firmly took control of all administrative sectors. Mrs. Kabamba also testified that she considered her children to be safer in the United States during her failed attempts to resettle in the DRC as the regimes in power changed.

Mrs. Kabamba's testimony that citizens of the DRC were hopeful of change under the second Kabila regime but were disappointed in that regard is consistent with the record evidence. There is documentary evidence in the record that the government that overthrew the Mobutu government was claiming political tolerance towards former Mobutu collaborators. The documentary evidence also reflects that Joseph Kabila, who inherited autocratic powers from his father Laurent Kabila, promised human rights reforms several times after his ascension to power but delivered relatively little on that front, with violence against ethnic groups and women

10

continuing. See also Mulanga, 349 F.3d at 130 (wherein petitioner seeking asylum from the DRC testified that "it's the same thing, father and son"). Thus, as the record reflects and the IJ acknowledged, despite efforts and promises, matters have not improved in the Congo for collaborators of deposed regimes nor for ethnic Tutsis or women.

In short, in view of the well-documented governmental assurances of tolerance and change that ultimately did not materialize, the fact that Mrs. Kabamba initially failed to appreciate the continued danger of remaining in her country of origin does not belie her current well-founded fear that she and her children will face further persecution if returned to the DRC.

5.   The petition for review is granted. As the IJ expressly acknowledged, Mrs. Kabamba's testimony, if believed, establishes a well-founded fear of persecution based on her status as an ethnic Tutsi whose husband served in the former Mobutu regime. INA § 101(1)(42), Elias-Zacarias, 52 U.S. at 482. The IJ erred in discrediting aspects of Mrs. Kabamba's account of persecution on the basis of unreliable testimony and misperceived inconsistencies. The IJ's expressions of improbability and implausability do not give rise to any specific and cogent reasons to disbelieve Mrs. Kabamba's testimony supporting her claim. The IJ's credibility determination was not, therefore, supported by substantial evidence.

When an appellate court has held that an IJ's or BIA's adverse

11

credibility finding is not supported by substantial evidence, and the BIA has not addressed the merits of a petitioner's application, the proper procedure is to remand the case to the BIA for further consideration in light of the ruling that the petitioner is credible. INS v. Ventura, 537 U.S. 12 ,16, 123 S.Ct. 353, 355 (2002) (holding that "a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands"). We remand to the BIA for further decision consistent with the directions of the Supreme Court in Ventura for the determination of whether the Kabamba's petition for asylum or other relief should be granted.

PETITION GRANTED, CASE REMANDED.