Ida **DAMKO**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE**, Respondent.

Docket No. 02–4830.

United States Court of Appeals, Second Circuit.

Argued: April 5, 2005.

Decided: Nov. 30, 2005.

Daniel A. Eigerman, Roger J. Bernstein, New York, NY, for Petitioner.

Sarah Y. Lai, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York, Kathy S. Marks, Assistant United States Attorney, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Respondent.

Before: WINTER, CABRANES, and POOLER, Circuit Judges.

Judge POOLER concurs in a separate opinion.

JOSÉ A. CABRANES, Circuit Judge.

Petitioner Ida Damko, a native and citizen of Albania, seeks review of an October 29, 2002 order of the Board of Immigration Appeals ("BIA") affirming an April 2, 2001 decision by an immigration judge ("IJ") that denied petitioner's application for asylum and withholding of removal. Where, as here, the BIA affirmed the IJ's decision summarily, we review the IJ's decision rather than the BIA's order. *See, e.g., Yu Sheng Zhang v. DOJ*, 362 F.3d 155, 158–59 (2d Cir.2004).

Petitioner's claim for asylum rests principally on the fact that, after a 1973 encounter with the security services of Albania's Communist regime, she was summarily dismissed from her engineering studies at a university. For the following twenty years, she was confined to an industrial job, which she eventually lost, allegedly for political reasons. The IJ concluded (1) that the economic deprivations petitioner had suffered in Albania did not rise to the level of persecution, and, in the alternative, (2) that Albania had undergone a significant change in circumstances such that petitioner no longer had a well-founded fear of persecution. With respect to the IJ's first conclusion, we hold that, under the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1101 *et seq.* ("INA"), economic deprivations may rise to the level of persecution if they are "so severe that they constitute a threat to an individual's life or freedom," *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985). We review the IJ's determination that petitioner's economic deprivations did not threaten her life or freedom under the "substantial evidence" standard and, under that standard, we hold that the IJ correctly found petitioner ineligible for asylum. We therefore deny her

petition without reviewing the alternative rationale for the IJ's decision.

## BACKGROUND

On January 15, 1999, petitioner entered the United States on a tourist visa. Her visa expired six months later, but she remained in this country.

In January 2000, petitioner submitted to the Immigration and Naturalization Service ("INS")[1] an application for asylum and for withholding of removal. The account below is drawn largely from petitioner's submissions. Petitioner alleged that in 1973, when she was a university student in Communist Albania, she acted as an interpreter for visiting relatives from the United States, and for that reason was detained and interrogated by security agents. Although petitioner reports that she was released after the interrogation, she allegedly experienced "a hostile attitude" upon returning to her university and was dismissed from the university before she was able to complete her engineering degree. Petitioner subsequently began working at a plant, where she remained employed as a supervisor for approximately twenty years. At one point during those twenty years, petitioner was allegedly "accused of sabotage" and "once again interrogated," but she was neither fired nor imprisoned in connection with that incident. Petitioner asserted that she was ultimately fired from the plant on May 24,

1994 because she "was not a member of the Socialist Party that [was in] charge of the state."

On March 15, 2000, the INS served petitioner with a Notice to Appear, charging that she was subject to removal from the United States, pursuant to 8 U.S.C. § 1227(a)(1)(B),[2] as a nonimmigrant who remained in the United States for a longer period than permitted. At a hearing before the IJ, petitioner conceded, through counsel, that she is removable, but sought relief in the form of asylum and withholding of removal. Having requested time to supplement her asylum application, petitioner submitted a second application on July 12, 2000. The facts asserted in petitioner's second application were substantially similar to those asserted in her original application, but certain additional details were supplied. For example, petitioner offered an account of the psychological distress, culminating in a suicide attempt, that she experienced upon being suddenly dismissed from the university.

Additional information was also provided regarding petitioner's employment at the plant. Unlike petitioner's original asylum application, which described petitioner's job as supervisory, her second application asserted that she had been a "laborer."[3] Petitioner stated that the plant initially offered her no "credit for the years of university, but because [she] was very knowledgeable because of [her] college

1. On March 1, 2003, the INS was reconstituted as the Bureau of Immigration and Customs Enforcement within the Department of Homeland Security. Because the BIA and IJ decisions implicated here were issued when the agency was still the INS, we will refer to it as the INS throughout this opinion. *See, e.g., Gelman v. Ashcroft,* 372 F.3d 495, 497 n. 2 (2d Cir.2004).

2. Section 1227(a)(1)(B) provides that "[a]ny alien who is present in the United States in violation of this Chapter or any other law of

the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under [8 U.S.C. § 1201(i) ], is deportable."

3. When asked about this inconsistency during her subsequent testimony, petitioner attributed it to an error made by a student who helped her to complete the original application.

years, they assigned an operator position in one of the most difficult process[es] of the plant." Petitioner further asserted that "[d]uring 20 years work in that plant, [she] was punished with hard labor without pay several times for the most absurd reasons." Furthermore, "[a]fter a general strike that was all over Albania" in 1991, petitioner was allegedly fired, but was later rehired by the same plant.[4] Her husband lost his job in 1992. On May 24, 1993 (one year earlier than indicated in the original asylum application), petitioner was "fired again," this time permanently. She was then allegedly "forced to try and make a living by sewing clothes for very little money." Petitioner submitted various documentary evidence in support of the allegations made in her application.[5]

Petitioner's removal proceedings resumed on February 1, 2001, when petitioner testified before the IJ to facts along the lines of those asserted in her asylum applications. In particular, petitioner testified that she could not trace her dismissal from the university to any academic shortcomings on her part and therefore attributed the dismissal to her 1973 encounter with the Albanian security services. Petitioner further testified that her subsequent twenty years of work at a plant exposed her to strenuous and potentially dangerous working conditions—conditions that, according to petitioner, "not too many females" were generally forced to endure. At one point, petitioner stated that "because [she] finished the [engineering] faculty," she was able to operate much of the plant's equipment. A lengthy exchange between the IJ and petitioner ensued, in which the IJ sought to determine whether petitioner completed her engineering degree or, as

petitioner's asylum applications had asserted, the university dismissed her without a diploma.

On cross-examination by the Government, petitioner admitted that she was fired from her plant job in 1993 amidst a "destroyed" Albanian economy, where layoffs were not uncommon. Moreover, according to petitioner, she was fired (allegedly for not being a member of the Socialist Party) at a time when the Democratic Party, which she apparently supported, was in power. Petitioner insisted, however, that the plant supervisor who fired her was, unlike the officials then ruling Albania, a member of the Socialist Party. Petitioner also confirmed that, at the time she left Albania, she "was a tailor—[a] private tailor working in [her] house." Petitioner's husband, who remains in Albania, had been unable to find steady employment and had relied on finding odd jobs. Petitioner was the only witness to testify at her removal proceedings.

On April 2, 2001, the IJ found petitioner removable and denied her application for relief in the form of asylum and withholding of removal. The IJ's oral decision highlighted three aspects of petitioner's testimony that were found inconsistent or otherwise not credible: (1) ambiguity as to why petitioner's relatives, at least one of whom appeared to speak Albanian, required petitioner to serve as a translator during their 1973 visit to Albania; (2) petitioner's contradictory statements with respect to the extent of university-level engineering education she was able to complete in Albania; and (3) petitioner's inconsistent descriptions of her plant job

---

**4.** According to petitioner's subsequent testimony before the IJ, her period of unemployment in 1991 lasted "a few weeks."

**5.** Among the documents submitted by petitioner are employment records indicating that

she and her husband each received social assistance for one year after becoming unemployed.

as supervisory and nonsupervisory. The IJ did not, however, make a general adverse credibility finding.[6]

The IJ then concluded that—for two independent reasons—the credible portions of petitioner's testimony did not demonstrate that she is eligible for asylum or withholding of removal. First, the IJ ruled that petitioner failed to establish that she suffered persecution, because "persecution," as defined by statutory and case law, "generally requires a level of mistreatment rising well above the level described by" petitioner.[7] Second, the IJ made a finding of significantly changed circumstances in Albania, such that petitioner—assuming *arguendo* she had suffered persecution by Albania's Communist regime, which collapsed in 1992—would no longer have a well-founded fear of persecution.

Petitioner appealed the IJ's decision to the BIA. On October 29, 2005, the BIA summarily affirmed.

Petitioner filed a timely petition for review to this Court.

### DISCUSSION

■ For the reasons set forth below, we hold that the IJ properly determined that economic deprivations petitioner had suffered did not rise to the level of persecution. We need not, therefore, review the IJ's alternative finding of changed circumstances in Albania.[8]

6. The IJ explained his decision not to make a general adverse credibility finding as follows:
   I don't really know, but overall I will find the general story to be credible and believable. It was generally, other than those exceptions that I stated, consistent with the written application. It was not prone to over exaggerations. Frankly if she was going to make up a story to get asylum, I think she would have made up a story quite a bit stronger than this one.

7. The IJ recognized that petitioner encountered significant difficulties during the twenty-five year period between her encounter with security services and her departure from Albania. The IJ also found, however, that petitioner, *inter alia*, "managed to work, ... she managed to marry, she managed to have a son who's attending high school [in Albania] and may go on to college, she managed to open a tailor business out of her house."

8. Either of the IJ's conclusions would be legally sufficient to support his determination that petitioner is ineligible for asylum. It is well-settled that, as a prerequisite for asylum eligibility, an applicant must demonstrate that she meets the statutory definition of a "refugee" contained in 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1)(B)(i). To meet this definition, an applicant must show that she suffered past persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion," or that she has a well-founded fear of future persecution on these grounds. 8 U.S.C. § 1101(a)(42)(A); *see also Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 148 (2d Cir.2003). A showing of past persecution creates a presumption of a well-founded fear of future persecution, which may be rebutted "if 'a preponderance of the evidence establishes that a change in circumstances in the applicant's country of nationality has occurred such that the applicant's fear is no longer well-founded.'" *Id.* (quoting *Guan Shan Liao v. DOJ*, 293 F.3d 61, 67 (2d Cir.2002)). If the presumption of a well-founded fear of future persecution is thus rebutted, an asylum applicant who relies solely on allegations of past persecution bears the burden of showing that this past persecution was of such "severity" as to offer "compelling reasons" for a grant of asylum. 8 C.F.R. § 208.13(b)(1)(iii)(A); *see also Liao*, 293 F.3d at 67.

   Here, the IJ held that petitioner did not establish past persecution and that, if she *had* established past persecution, the presumption of a well-founded fear of future persecution would be rebutted. Other than her allegations of past persecution, petitioner did not allege any grounds supporting a fear of future persecution. Nor did petitioner allege that the "severity" of the past persecution she had suffered offered "compelling reasons" for asylum. Therefore, under the established principles of immigration law summarized above, either of the IJ's two alternative rulings is an

### I. Standard for "Economic" Persecution Under the INA

We begin by identifying the standard that a petitioner must meet under the INA to demonstrate that she has suffered "persecution" by means of economic deprivation. When confronted with "questions implicating 'an agency's construction of the statute which it administers,'" we apply "the principles of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* [467 U.S. 837, 104 S.Ct. 2778 (1984)]." *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *see also Medina v. Gonzales,* 404 F.3d 628, 633 (2d Cir. 2005). In cases implicating the BIA's construction of the INA, the Supreme Court has found it "clear that principles of *Chevron* deference are applicable." *Aguirre–Aguirre,* 526 U.S. at 424, 119 S.Ct. 1439.

Our analysis under *Chevron* must begin with an inquiry into whether "the statute is silent or ambiguous with respect to the specific issue" before us, 467 U.S. at 843, 104 S.Ct. 2778—in this case, the degree of economic deprivation that rises to the level of persecution. We conclude that the INA is "silent or ambiguous" on this point because it includes, but does not define, the term "persecution" in its definition of a "refugee," 8 U.S.C. § 1101(a)(42)(A), and because it does not address the concept of persecution through economic deprivation at all.

Accordingly, we proceed to the second step of *Chevron* analysis and inquire whether the BIA's definition of economic persecution, if any, is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. If the construction is reasonable, we must defer to it. *Khouzam v. Ashcroft,* 361 F.3d 161, 164 (2d Cir.2004).

In *Matter of Acosta,* 19 I. & N. Dec. 211, 222 (BIA 1985) (overruled in part by *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)[9]), the BIA defined "persecution" generally as "harm or suffering ... inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor sought to overcome" and "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." Most significant for petitioner's asylum claim, the harm or suffering inflicted can consist of "economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom." *Id.*[10]

adequate and sufficient basis for denial of petitioner's asylum application.

**9.** In *Cardoza–Fonseca,* the Supreme Court held that the phrase "well-founded fear of persecution" in 8 U.S.C. § 1101(a)(42), *see* note 8 *ante,* is distinct from the phrase "life or freedom would be threatened" in 8 U.S.C. § 1231(b)(3) (stating the standard for withholding of removal). *See Cardoza–Fonseca,* 480 U.S. at 430, 107 S.Ct. 1207. The BIA's *Acosta* decision has been overruled only insofar as it is inconsistent with that statutory construction. *See Matter of Mogharrabi,* 19 I. & N. Dec. 439, 446 (BIA 1987) (holding that *Acosta* "has been effectively overruled by" *Cardoza–Fonseca* only "insofar as *Acosta* held that the well-founded fear standard and the

[withholding of removal] standard may be equated" and that "much of [*Acosta* ] remains intact and good law"). Here, we address *Acosta* 's construction of the term "persecution" in the context of "past persecution" rather than in the context of "well-founded fear of future persecution"—an aspect of *Acosta* that survives *Cardoza–Fonseca.*

**10.** Our concurring colleague argues that subsequent BIA decisions cast doubt upon the rule stated in *Acosta* and instead follow *Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969) (defining economic persecution as "deliberate imposition of substantial economic disadvantage"). She concludes that the BIA's position is therefore inconsistent and not entitled to

■ We find nothing in our previous decisions, or in those of our sister Circuits, to suggest that the BIA's construction of

*Chevron* deference. *See post*, at 638 (citing *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993)). For this conclusion, the concurrence relies principally on *Matter of Barrera*, 19 I. & N. Dec. 837, 847 (BIA 1989), but *Barrera* in no way adopted the *Kovac* standard for economic persecution claims. Instead, the BIA found that the group to which petitioner belonged—a subset of returnees to Cuba (participants in the Mariel boatlift)—faced no persecution as a class. Rather, the Cuban government had imprisoned some returnees who, like Barrera, had committed serious crimes while in the United States. *Id.* at 838, 846–48. Only in passing does the opinion mention *Kovac*, while listing various forms of persecution to which petitioner's class had *not* been subjected. *Id.* at 847. The passing mention in *Barrera* differs from the BIA's statement in *Acosta* because in *Acosta*, the BIA made an affirmative effort to define "persecution" generally—including economic persecution—in the course of interpreting new statutory language. In *Barrera*, by contrast, the BIA merely applied settled law to the facts at hand, which did not call for a redefinition of economic persecution or "persecution" generally.

Because neither *Barrera* nor any other BIA case contradicts *Acosta*, the principle of *Good Samaritan* simply does not apply here. *See Good Samaritan*, 508 U.S. at 417, 113 S.Ct. 2151 (holding that "the consistency of an agency's position is a factor in assessing the weight that position is due" and that "agency interpretation of a relevant provision *which conflicts with the agency's earlier interpretation* is entitled to considerably less deference than a consistently held agency view.") (internal quotation marks omitted) (emphasis added).

11. The decisions of our Court that, without acknowledging or discussing *Acosta*, suggest a broader definition of economic persecution do so in dictum. *See Liao*, 293 F.3d at 67 ("Various types of conduct constitute persecution, such as, for example, the deliberate imposition of a substantial economic disadvantage.") (citing *Yong Hao Chen v. INS*, 195 F.3d 198, 204 (4th Cir.1999)); *see also Cao He Lin v. DOJ*, 428 F.3d 391, 406 n.5 (2d Cir. 2005) (quoting *Liao* without discussion). In *Liao*, the petitioner sought asylum based

the INA in *Acosta* was not reasonable. If anything, we have tacitly approved this construction.[11] *See United States v. Soko-*

mainly on the coercive family planning policies of the People's Republic of China, but also alleged persecution through economic deprivation in the form of fines and the "seal[ing]" or destruction of his house. 293 F.3d at 67–70. We noted that the economic persecution claim in *Liao* had been waived by the petitioner, and we then addressed the merits of that claim only "for purposes of completeness." *Id.* at 69. In doing so, we did not cite or address the BIA's *Acosta* decision and relied instead on an opinion from a sister Circuit that, in turn, relied on pre-*Acosta* case law. *See id.* (citing *Chen*, 195 F.3d at 204 (quoting *Borca v. INS*, 77 F.3d 210, 215–16 (7th Cir.1996) (citing *Kovac*, 407 F.2d at 105–07))); *see also* note 12, *post*.

We also recently remanded an asylum claim to the BIA for consideration of "any evidence of economic retaliation" in light of *Liao*. *Cao He Lin*, 428 F.3d at 406 n.5. In directing the BIA to consider *Liao*, *Cao* neither acknowledged nor discussed the BIA's prior construction of the INA in *Acosta*. *Id.* We therefore find nothing in these cases to suggest that the statutory construction in *Acosta* was impermissible.

Assuming *arguendo* that in *Liao* and *Cao* we adopted an interpretation of the INA directly in conflict with the BIA's interpretation in *Acosta*, our earlier decisions *still* would not preclude us from affording *Chevron* deference to *Acosta*. The Supreme Court recently resolved the "genuine confusion in the lower courts over the interaction between the *Chevron* doctrine and *stare decisis* principles." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, — U.S. ——, ——, 125 S.Ct. 2688, 2702, 162 L.Ed.2d 820 (2005). It held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 2700 (emphasis added). Even if our prior decisions in *Liao* and *Cao* can be said to have construed the meaning of "economic persecution" under the INA, neither decision suggested that its construction "follows from the unambiguous

*lov*, 814 F.2d 864, 874 (2d Cir.1987) (noting that "Webster's Dictionary defines 'persecution' as 'the infliction of sufferings, harm, or death on those who differ ... in a way regarded as offensive or meriting extirpation'"); *see also Alvarado–Carillo v. INS*, 251 F.3d 44, 47–48 (2d Cir.2001) (vacating and remanding denial of asylum claim for consideration on, *inter alia*, economic persecution grounds, where petitioner, who had been trained as an accountant, was reduced to selling food from a street cart, which was subsequently set on fire). Moreover, other Circuits have relied on the definition of economic persecution articulated by the BIA in *Acosta*.[12] *See Daneshvar v. Ashcroft*, 355 F.3d 615, 625 n. 9 (6th Cir.2004) (relying on *Acosta* for the proposition that economic deprivation must be "sufficiently severe" in order to constitute persecution); *Sharif v. INS*, 87 F.3d 932, 934–35 (7th Cir.1996) (relying on *Acosta* for the proposition that economic deprivation constitutes persecution "when the resulting conditions are sufficiently severe" to threaten "the infliction of substantial harm or suffering"; and holding that the petitioner who "was unable to attend college," "lost her job" but "found another," and whose "family sustains itself by growing and selling agricultural products" did not make out a claim of economic persecution).

We therefore recognize the BIA's definition of economic persecution—"economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom," *Acosta*, 19 I. & N. Dec. at 222—as the agency's permissible construction of the INA to which we are required to defer.[13]

terms of the statute and thus leaves no room for agency discretion." Accordingly, *Liao* and *Cao* do not preclude us from according *Chevron* deference to the BIA's construction of the INA in *Acosta*.

**12.** Those cases from other Circuits that apply a broader definition of economic persecution rely on *Kovac*, 407 F.2d 102 (9th Cir.1969), a pre-*Acosta* decision. These cases therefore necessarily do not adopt—or defer to—to the BIA's construction of the INA in *Acosta*. *See Kovac*, 407 F.2d at 104, 109 (holding that well-founded fear of persecution was established by "a probability of deliberate imposition of substantial economic disadvantage upon an alien for reasons of race, religion, or political opinion," and remanding denial of asylum where "[i]t became impossible for [a chef] to obtain employment in the occupation for which he was trained"); *see also Chen*, 195 F.3d at 204 (relying on the economic persecution standard set forth in *Kovac*); *Gonzalez v. INS*, 82 F.3d 903, 910 (9th Cir. 1996) (same); *Borca*, 77 F.3d at 215–16 (adopting the definition of economic persecution from *Kovac*, based in part on the erroneous conclusion that the BIA had also adopted that definition in *Acosta*).

We note that in *Li v. Attorney General*, 400 F.3d 157 (3d Cir.2005), the case cited in the concurrence to show that no subsequent BIA case has explicitly relied upon *Acosta* in adjudicating an economic persecution claim, *see post*, at 638, the Third Circuit expressly adopts the *Acosta* rule despite this finding. *See id.* at 168 ("Informed by the reasoning of these cases [considering *Acosta* and *Kovac*], we hold that the deliberate imposition of severe economic disadvantage which threatens a petitioner's life or freedom may constitute persecution. (This is the *Acosta* standard).").

**13.** Our concurring colleague misstates, we submit, the appropriate legal standard in arguing that because the BIA has not "made a clear statement regarding the applicable standard," we do not owe *Chevron* deference to the agency interpretation. *See post*, at 638. Under *Chevron*, the question is whether *Congress* has clearly indicated its intent. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. 2778. But when a reviewing court finds that Congress has not "directly addressed" the question at issue, the agency's determination prevails if it "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. No "clear statement" rule restricts *Chevron* deference to "super clear," or especially unambiguous, agency statements—or to those cited in a certain number of subsequent cases.

## II. Petitioner's "Economic" Persecution Claim

■■■■ We now turn to whether petitioner demonstrated that she had suffered persecution—or, more specifically, whether petitioner's economic deprivations threatened her life or freedom. As a threshold matter we must identify the standard for reviewing the IJ's determination that, notwithstanding the general credibility of petitioner's testimony, petitioner had not made the requisite showing. The INA provides that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The Supreme Court has stated that evidence that would compel a conclusion contrary to an IJ's finding indicates a lack of substantial evidence in support of that finding. *See INS v. Elias–Zacarias*, 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We have previously equated the "substantial evidence" standard and the standard of Section 1252(b)(4)(B): "To reverse under the substantial evidence standard, 'we must find that the evidence not only *supports* [the conclusion opposite to the IJ's finding], but *compels* it.'" *Ahmed v. Ashcroft*, 286 F.3d 611, 612 (2d Cir.2002) (quoting *Elias–Zacarias*, 502 U.S. at 481 & n. 1, 112 S.Ct. 812); *see also, e.g., Ramsameachire v. Ashcroft*, 357 F.3d 169, 177 (2d Cir.2004) (quoting *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir.2000) and *Melgar de Torres v. Reno*, 191 F.3d 307, 313 (2d Cir.1999)). Yet when "review centers on the [BIA's] application of legal principles to undisputed facts, we review the determination reached ... *de novo.*" *Guan Shan Liao v. United States*, 293 F.3d 61, 66 (2d Cir. 2002); *see also, e.g., Alvarado–Carillo v. INS*, 251 F.3d 44, 49 (2d Cir.2001) (quoting *Diallo*, 232 F.3d at 287).

In any event, in this case the BIA's statement was clear. In reviewing what kinds of "suffering or harm" may be considered "persecution," *Acosta* discusses confinement and torture. It then says such suffering or harm "could consist of economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom." 19 I. & N. Dec. at 222. The case cited by *Acosta* to support the definition of economic persecution, *Dunat v. Hurney*, 297 F.2d 744 (3d Cir. 1962), distinguished between "sanctions that may tend to lead to social ostracism, or deny one an opportunity to obtain and enjoy some of the social niceties and physical comforts"— which did not satisfy the standard—and "denial of an opportunity to earn a livelihood in a country [where such treatment] is the equivalent of a sentence to death by means of slow starvation"—which did. *Id.* at 746. The BIA was clear in interpreting the statute to mean that only economic persecutions "so severe that they constitute a threat to an individual's life or freedom" qualify one for asylum.

Our deference to the BIA's *Acosta* decision does not run afoul of out recent decision in *Shi Liang Lin v. DOJ*, 416 F.3d 184 (2d Cir. 2005), where we declined to accord *Chevron* deference to an IJ's construction of the INA when that construction had been summarily affirmed by the BIA. We explained in *Lin* that the BIA's regulations do not treat the BIA's summary affirmances as "'approval of all of the reasoning'" invoked by the underlying IJ decision, *id.* at 190 (quoting 8 C.F.R. § 1003.1(e)(4)), or as "binding in any event," *id.* at 191. We also noted that, since IJs' statutory constructions are nonbinding, affording each of them *Chevron* deference could place us "in the impossible position of having to uphold as reasonable on Tuesday one construction that is completely antithetical to another construction we had affirmed as reasonable the Monday before." *Id.* at 190. These concerns are not implicated here, where the IJ did not engage in independent statutory construction, but rather relied on the BIA's prior construction of the INA to which we, in turn, accord deference. Notably, in *Acosta*, the BIA did not construe the INA under its streamlined procedures that generate summary nonbinding affirmances. Accordingly, affording *Chevron* deference to *Acosta*—a binding decision of the BIA rather than a nonbinding decision of an IJ—does not raise the specter of inconsistent rulings within our Circuit.

We hold that the IJ's determination here—that petitioner's deprivations were not so severe as to constitute a threat to her life or freedom—should be reviewed under the "substantial evidence" standard rather than *de novo*. The Supreme Court has underscored that judicial review of Executive Branch actions in the immigration context must remain particularly deferential. *Aguirre–Aguirre*, 526 U.S. at 425, 119 S.Ct. 1439 ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'") (quoting *INS v. Abudu*, 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)). Moreover, a determination as to whether petitioner's life or freedom was threatened is a quintessential "administrative finding[ ] of fact"—precisely the sort of finding that the INA directs us to review deferentially. 8 U.S.C. § 1252(b)(4)(B).

■ As a practical matter, we also hesitate to suggest that an IJ's factual conclusions merit no deference in cases where, as here, no general adverse credibility finding was made. Commonly, as in this case, the asylum applicant is the sole witness testifying, often with the help of a translator, to events that took place in the distant past and in distant lands. We have previously noted that IJs, who encounter and adjudicate asylum claims routinely, possess a unique competency in making credibility findings, *see Zhou Yun Zhang v. INS*, 386 F.3d 66, 73–74 (2d Cir.2004)— and this competency surely extends to factfinding generally. We therefore hold that, even when no general adverse credibility finding has been made, an IJ's pre-dominantly factual conclusion should be reviewed under the "substantial evidence" standard.[14]

The IJ here was asked to make a predominantly fact-based determination regarding the *effect* of petitioner's economic deprivations on her life or freedom. Accordingly, we review the IJ's determination deferentially, pursuant to the "substantial evidence" standard.

■ In this case, substantial evidence in the record supports the IJ's conclusion that petitioner's economic deprivations did not threaten her life or freedom. As the IJ properly acknowledged, petitioner resided in a country with a history of economic struggle and authoritarian rule. There, petitioner encountered a score of injustices, which caused her such psychological distress that she attempted suicide upon being dismissed from the university. Nonetheless, after receiving several years of higher education,[15] petitioner was almost continuously employed at the same plant for approximately 20 years. Although fired from her job in 1993, she received social assistance from the government for the following year; her husband likewise received such assistance the year after he was fired. *See* note 5, *ante*. Petitioner also testified that she worked as a seamstress out of her home after losing her job and that her husband performed odd jobs.

Accepting all of this testimony as true, it is beyond doubt that petitioner survived straitened economic circumstances.

■ It is likewise beyond peradventure that petitioner's asserted expulsion from university was not fair. But "persecution

---

**14.** Of course, having made no general adverse credibility finding, an IJ cannot rest his findings of fact on an asylum seeker's general lack of credibility.

**15.** As noted earlier, the IJ found petitioner's testimony about the precise extent of her university education ambiguous.

does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin v. INS*, 12 F.3d 1233, 1240 (3rd Cir.1993); *see also Vatulev v. Ashcroft*, 354 F.3d 1207, 1210 (10th Cir.2003) (holding that "institutional discrimination" in education and employment, "while deplorable in any free society, did not constitute persecution"); *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995) ("[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive. Discrimination . . ., as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the [INA]."). To make a showing of actual economic persecution, the BIA has reasonably held that an applicant must show that she was a victim of economic deprivation so severe that her life or her freedom was threatened. *See Sharif*, 87 F.3d at 935 ("[I]n order to be an act of [economic] persecution, the behavior in question must threaten death, imprisonment, or the infliction of substantial harm or suffering." (citing *Acosta*, 19 I. & N. Dec. at 222)). Petitioner has not met that burden. Based on her testimony and application, a reasonable factfinder would not be *compelled* to find that petitioner suffered economic deprivations severe enough to threaten her life or freedom. *See* 8 U.S.C. § 1252(b)(4)(B). Because petitioner failed to demonstrate that she suffered past persecution—and because she has not articulated any claim of fear of future persecution that does not fully rely upon claims of past persecution—she has not established eligibility for asylum. *See* note 8, *ante*.

An applicant who, like petitioner, fails to establish eligibility for asylum is necessarily unable to establish her eligibility with-holding of removal. *See Abankwah v. INS*, 185 F.3d 18, 22 (2d Cir.1999).

## CONCLUSION

We conclude that petitioner failed to establish that the economic deprivations she had suffered in Albania rose to the level of persecution, such that she would be eligible for asylum or withholding of removal under the INA. Accordingly, her petition for review is denied.

POOLER, Circuit Judge, concurring in the judgment.

I concur in the judgment but, respectfully, cannot join the majority's reasoning. In determining that the economic deprivations Damko suffered in Albania did not rise to the level of economic persecution, the majority announces a standard that is contrary to a holding of this Court, in tension with Supreme Court and BIA precedent, and unnecessary to decide in this case.

The majority advocates that we apply the economic persecution definition that was originally stated in *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985) (overruled in part by *INS v. Cardoza–Fonseca*, 480 U.S. 421, 423–24, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) and *Matter of Moghar-rabi*, 19 I. & N. Dec. 439, 439 (BIA 1987)). The *Acosta* definition states, in relevant part, that a petitioner can establish a persecution claim if she has experienced "economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom." *Acosta*, 19 I. & N. Dec. at 222. In contrast, the appropriate economic persecution standard, which was first set out by the Ninth Circuit in *Kovac v. INS*, is that a petitioner may establish economic persecution based on a "deliberate imposition of substantial economic disadvantage." 407 F.2d 102, 107 (9th Cir. 1969).

As an initial matter, I disagree with the majority's facile determination that the

BIA has made a clear statement regarding the applicable standard for economic persecution.[1] Because—(1) *Acosta* was not an economic persecution case[2]; (2) the BIA has not subsequently used the *Acosta* definition for economic persecution cases; and (3) the BIA has subsequently applied the Ninth Circuit's *Kovac* standard—*Chevron* deference is inappropriate. *See Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (stating that "the consistency of an agency's position is a factor in assessing the weight that position is due").[3] Since the BIA decided *Acosta* in 1985, it has never cited *Acosta* nor its definition in the context of an economic persecution claim. *See Li v. Attorney General,* 400 F.3d 157, 167 (3d Cir.2005); *see also Matter of H–M,* 20 I. & N. Dec. 683, 687, 691 (BIA 1993) (illustrating that, although faced with an economic persecution argument based on the *Kovac* standard, BIA failed to cite *Acosta* in response). The BIA, however, has cited the *Kovac* standard approvingly to some extent. *See Matter of Barrera,* 19 I. & N. Dec. 837, 847 (BIA 1989). In denying an applicant's claim, the BIA in *Barrera* cited *Kovac* and stated that the applicant's claim failed, in part, because there were no allegations that similarly

situated returnees to Cuba were "denied employment, education, housing, permission to travel, or other benefits of this sort." *Id.* The BIA's citation to *Kovac* instead of *Acosta* and its indication that denial of "benefits of this sort" could constitute persecution in some cases undermines the majority's contention that the BIA has adopted the *Acosta* "threat to life or freedom" definition for economic persecution claims.

My second difficulty with the majority opinion is its statement that this Court has "tacitly approved" the *Acosta* economic persecution definition. To the contrary, one of our *holdings* in *Guan Shan Liao v. United States Dep't of Justice* rests on the application of the broader *Kovac* standard. 293 F.3d 61, 70 (2d Cir.2002). In conjunction with our holding that petitioner did not present sufficient evidence to permit an economic persecution finding, we stated that "an asylum applicant must offer some proof that he suffered a deliberate imposition of substantial economic disadvantage." *Id.* (internal quotation marks omitted). The majority reasons that this determination was dictum because we elected to consider an arguably waived issue "for purposes of completeness." *Ante,* at n. 11.

1. Because of this disagreement, my analysis is not affected by the Supreme Court's recent decision that we should accord *Chevron* deference to an agency interpretation of a statute even where it conflicts with our prior cases unless there is no room for agency discretion. *Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.,* —— U.S. ——, ——, 125 S.Ct. 2688, 2700, 162 L.Ed.2d 820 (2005).

2. The BIA in *Acosta* was not faced with an economic persecution claim and merely noted this definition in passing. *See Matter of Acosta,* 19 I. & N. Dec. at 222. The majority does not find this to be significant in *Acosta,* but then argues *Matter of Barrera,* 19 I. & N. Dec. 837, is inapposite because it only mentions economic persecution in passing. *See ante* at n. 10.

3. My colleagues in the majority accuse me of misstating the appropriate standard by requiring a "super clear" statement by the BIA before we accord *Chevron* deference, *see ante* at n. 13, but I merely follow the Supreme Court's instruction in *Good Samaritan* that conflicting agency interpretations of a statute are " 'entitled to considerably less deference' than a consistently held agency view." 508 U.S. at 417, 113 S.Ct. 2151 (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434). Where an agency interprets a statute, in passing, and later interprets the same statute differently, even if only again in passing, *Chevron* does not require that we defer to the earlier interpretation. *Id.*

The *Liao* Court, however, did not make an explicit determination regarding whether the applicant waived the economic persecution issue on appeal to this Court. 293 F.3d at 69. Moreover, this Court's election to exercise its discretion to consider an issue that is arguably waived on appeal does not make its determination dictum. Once we choose to consider a waived issue, it is before the Court and our determination is binding, unless, of course, it is for some other reason unnecessary to the holding.

The majority also mis-characterizes our decision in *Alvarado–Carillo* as tacit approval of the *Acosta* standard, even though we make no mention of *Acosta* nor its definition in that case. *See Alvarado–Carillo v. INS*, 251 F.3d 44 (2d Cir.2001). In fact, our *Alvarado–Carillo* ruling suggests that we applied the broader *Kovac* standard. The *Alvarado–Carillo* court remanded, in part, for consideration of whether the petitioner's blacklisting and resulting demotion rose to the level of persecution. By implicitly acknowledging that a demotion could constitute persecution, *Alvarado–Carillo* tacitly rejected the *Acosta* "threat to life or freedom" standard. *Id.* at 47–48, 55–56.

Third, the majority's application of *Acosta* appears to conflict with the Supreme Court's decision in *Cardoza–Fonseca*, which based its holding on a determination that Congress intended for the asylum standard to be more generous than the withholding of removal standard. *See* 480 U.S. at 423–24, 107 S.Ct. 1207. The BIA has subsequently overruled *Acosta* "insofar as it held that the [asylum and withholding of removal] standards were not meaningfully different and, in practical application, converged." *Matter of Mogharrabi*, 19 I. & N. Dec. at 439.

The *Acosta* definition, relied on by the majority, establishes no meaningful difference between the asylum and withholding of removal standards for purposes of a past persecution claim. According to the *Acosta* definition, an asylum applicant cannot establish past persecution unless she has experienced economic deprivation so severe that it constituted a threat to an individual's *life or freedom*. Similarly, a withholding of removal applicant relying on a past persecution argument also must establish that she suffered a past threat to *life or freedom*. *See* 8 C.F.R. § 1208.16 (emphasis added). Thus, under the majority's holding, there would be no meaningful difference between the definitions of past persecution in the two standards, bringing the majority's holding into conflict with *Mogharrabi* and into tension with *Cardoza–Fonseca*, 480 U.S. at 423, 107 S.Ct. 1207 ("Congress did not intend the class of aliens who qualify [for asylum] to be coextensive with the class who qualify for [withholding of removal] relief.").

Despite my disagreement with the majority's economic persecution determination, I concur in the judgment. Even if Damko's past economic persecution is meritorious, she is still barred from relief. The Immigration Judge's decision was based on two determinations, (1) that the economic deprivations Damko suffered did not rise to the level of past economic persecution and, in the alternative, (2) that, even if Damko had established past economic persecution, the government met its burden of showing that Albania had undergone a significant change in circumstances such that Damko no longer had a well-founded fear of future persecution. While Damko appealed the first ruling to the BIA, she failed to appeal the alternative "changed circumstances" ruling. Accordingly, Damko failed to exhaust her claim to the BIA and thereby could not succeed on appeal to this Court even if we unanimously agreed that she suffered past persecution in Alba-

nia.  *See Cervantes–Ascencio v. INS*, 326 F.3d 83, 87 (2d Cir.2003).  I therefore concur only in the judgment.