Elhadj Amadou TANDIA, Petitioner,

v.

Alberto GONZALES, Attorney
General,* Respondent.

Docket No. 03–4942.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 30, 2006.

Decided: Feb. 7, 2006.

* Pursuant to Federal Rule of Appellate Proce-
dure 43(c)(2), Attorney General Alberto Gon-
zales is substituted for his predecessor, Attor-
ney General John Ashcroft, as the respondent
in this case.

Alexander Kaplan (Steven C. Krane, on the brief), Proskauer Rose LLP, New York, NY, for Petitioner.

Barbara S. Sale, Assistant United States Attorney (Rod J. Rosenstein, United States Attorney for the District of Maryland, William P. Jauquet, Law Clerk, on the brief), United States Attorney's Office for the District of Maryland, Baltimore, MD, for Respondent.

Before: WINTER, CABRANES, and B.D. PARKER, Circuit Judges.

PER CURIAM.

We consider here the proper standards for reviewing a decision by an immigration judge ("IJ") denying asylum to an otherwise qualified applicant on the ground that the applicant has found a "safe haven" in a third country before applying for asylum in the United States. Such authority of the Attorney General was conferred by statute, and exercised for some years under two separate regulations (each now repealed) promulgated by the Attorney General. *See* 8 U.S.C. §§ 1158(b)(2)(C), 1158(d)(5)(B).[1] The regulation more recently in force, 8 C.F.R. § 208.13(d), provided that "an asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution." *See* 62 Fed.Reg. 10312, 10342 (Mar. 6, 1997) (announcing regulation); *see also* Asylum Procedures, 65 Fed.Reg. 76121, 76126 (Dec. 6, 2000) (repealing regulation).[2] According to the

1. Pursuant to 8 U.S.C. § 1158(d)(5)(B), the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with" the Immigration and Nationality Act. Section 1158(b)(2)(C) provides that the Attorney General "may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum ...."

2. The earlier of the two regulations, formerly codified at 8 C.F.R. § 208.14(e), was enacted pursuant to 8 U.S.C. § 1158(a)(2)(A). *See* 59 Fed.Reg. 62284, 62295 (Dec. 5, 1994). When 8 C.F.R. § 208.14(e) was in force—that is, from January 4, 1995 until April 1, 1997—the regulation stated that

[a]n application from an alien may be denied in the discretion of the Attorney General if the alien can and will be deported or

returned to a country through which the alien traveled en route to the United States and in which the alien would not face harm or persecution and would have access to a full and fair procedure for determining his or her asylum claim in accordance with a bilateral or multilateral arrangement with the United States governing such matter. 59 Fed.Reg. at 62301. Because of the provision's requirement of a relevant international agreement, 8 C.F.R. § 208.14(e) had no practical effect. *See* 59 Fed.Reg. at 62296 (stating that 8 C.F.R. § 208.14(e) was "contingent upon bilateral or multilateral agreements with other nations," that "no such agreements [then] exist[ed]," and that the regulation applied only to countries "through which the alien actually traveled en route to the United States"). Thus to fall under the scope of 8 C.F.R. 208.14(c), an alien had to travel through a country that was party to a nonexistent agreement.

Attorney General's statements in the Federal Register, the former 8 C.F.R. § 208.13(d) was promulgated under the authority of 8 U.S.C. §§ 1158(b)(2)(C) and 1158(d)(5)(B), neither of which refer to the presence of a bilateral agreement with a third country.[3] *See* 65 Fed.Reg. at 76126. Accordingly, when evaluating an IJ's exercise of discretion under the former 8 C.F.R. § 208.13(d), we need not consider whether the "third country which has offered resettlement" is party to a treaty with the United States concerning refugees.[4]

## I.

Petitioner Elhadj Amadou Tandia seeks review of an April 18, 2003 order of the BIA affirming without opinion a January 8, 2001 decision of IJ Gabriel C. Videla denying Tandia's requests for asylum and withholding of deportation under the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1101 *et seq.*[5]

According to Tandia's affidavit in support of his application and his testimony before the IJ, Tandia was born in Senegal in 1958 and later moved to Mauritania, becoming a national of Mauritania in 1974 or 1975. Asserting that he is a member of a prominent African–Mauritanian family with connections to the country's previous government, Tandia claimed that he received advanced academic degrees in France and then worked at a bank in Mauritania as a computer technician. Tandia asserted that he suffered persecution on the basis of race at the hands of the "white Moor" regime governing Mauritania.

Specifically, Tandia recounted being interrogated by police who ordered him "to report to them on African–Mauritanian opposition activities" on a daily basis. He alleged also that he was arbitrarily arrested and detained for "a day and a night" with no explanation and that he was forced

---

Pursuant to 8 U.S.C. § 1158(a)(2)(A), the statutory provision under whose authority the regulation was promulgated, an alien may not apply for asylum if the
  alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

3. Because the statutory provisions relied upon in promulgating 8 C.F.R. § 208.13(d) do not refer to international agreements, this regulation was enforceable from its effective date. *See* 62 Fed.Reg. 10312 (Mar. 6, 1997) (stating that "[t]his interim rule is effective

April 1, 1997"). It ceased to be enforceable upon its repeal. *See* Asylum Procedures, 65 Fed.Reg. 76121 (Dec. 6, 2000) (stating that rule effecting provision's repeal "is effective January 5, 2001").

4. We provide this background to clarify our discussion in *Dhoumo v. BIA*, 416 F.3d 172, 175 (2d Cir.2005), in which we discussed the "safe third country" exception by referring to 8 U.S.C. § 1158(a)(2)(A) without mentioning the former 8 C.F.R. § 208.13(d). Ignoring Section 208.13(d) was entirely appropriate in *Dhoumo* because the IJ there denied the petitioner's application on June 6, 2001, *see* 416 F.3d at 173, thus postdating the January 5, 2001 repeal of Section 208.13(d). For cases decided while the former 8 C.F.R. § 208.13(d) remained in force—that is, from April 1, 1997 until January 5, 2001—a treaty was not a necessary precondition to the IJ's exercise of discretion under Section 208.13(d).

5. The procedure called "withholding of deportation" at the time the IJ issued his decision is now referred to as "withholding of removal." *See* 8 C.F.R. § 208.16.

to promote the ruling regime while "distribut[ing] food and other necessaries to [his] community." Tandia maintains that although he reported to the police station and distributed goods among members of his ethnic group as ordered, he did not cooperate fully, refusing to share information about dissidents with the police or to speak well of the government to others. Fearing government reprisals, he fled to France, where he visited his sister and acquired more money for his journey. After about a month, he traveled to the United States. He stated that he fears future persecution should he return to Mauritania, having heard from family and friends that authorities there continue to search for him. As another basis for his fear, he claimed to participate in a United States-based group, the African Liberation Forces of Mauritania (abbreviated "FLAM" from the French), that opposes the current government.

The IJ stated in his decision that the "white Moors" largely in charge of Mauritania[6] have persecuted some of their "black African" countrymen, some of whom were "deported solely because they were black Africans." Nonetheless, the IJ found that Tandia failed to establish either that he personally was persecuted in Mauritania or that he had a well-founded fear of persecution upon return. He based his conclusion on a finding that Tandia's testimony was not credible. The primary reasons the IJ articulated in support of his

adverse credibility finding were (1) that Tandia could not remember whether certain statements he made before the IJ contradicted statements he made at his asylum interview and (2) that he failed to offer certain evidence to bolster his claims, such as offering his sister as a witness or documentation of his activities with FLAM in the United States. The IJ added that, even if Tandia's testimony were credible, he would exercise his discretion to deny him asylum because (1) he committed some low-level crimes[7] while in the United States and (2) he found a "safe haven" in France before arriving the United States.

## II.

■ When the BIA affirms an IJ's decision without opinion pursuant to the "streamlining" provision codified at 8 C.F.R. § 1003.1(e)(4), we review the IJ's decision as the final agency decision. *See, e.g., Damko v. INS*, 430 F.3d 626, 628 (2d Cir.2005).

■ We examine first the IJ's finding that Tandia found a "safe haven" in France. The IJ's decision is dated January 8, 2001, three days after the repeal of the regulation giving IJs discretion to deny asylum to applicants staying in a "safe third country" before arrival in the United States. *See* Asylum Procedures, 65 Fed.Reg. 76121, 76126 (Dec. 6, 2000) (listing effective date of January 5, 2001). We now hold explicitly, as in *Dhoumo* we

---

**6.** As the Department of State's 1993 Country Report on Mauritania's human rights practices noted, the country's Arabic-speaking minority has tended since the end of French colonial rule to dominate Mauritania's government, which has exacerbated racial tensions with the black African majority through policies such as "Arabization" of schools and the work force.

**7.** Tandia testified that between his arrival in the United States and his hearing before the

IJ, he was arrested for selling goods on the streets of New York without a vendor's license (multiple times), attempting to pay for cigarettes with subway tokens, and for his involvement in an incident during which a window was broken. Tandia asserted that he was assessed small fines, which he paid, and on occasion held overnight in jail. The IJ's decision did not include a finding that Tandia had committed any aggravated felonies or crimes of moral turpitude.

did implicitly, that an IJ finding concerning a "safe third country" or "safe haven" cannot rely upon 8 C.F.R. § 208.13(d) if contained in a decision dated on or after January 5, 2001.[8] In such cases, sojourns in third countries will be evaluated under the standards governing our review of an IJ decision based upon a finding that an applicant was "firmly resettled" in a third country before arriving in the United States.[9] *See* 8 C.F.R. § 208.15 (defining aliens who have "firmly resettled"); 8 U.S.C. § 1158(b)(2)(a)(vii) (barring such aliens from receiving asylum). In *Sall v. Gonzales*, 437 F.3d 229 (2d Cir.2006), which was argued in tandem with this case, we set forth the standards governing our review of IJ decisions based upon findings of firm resettlement.

■ Tandia's stay in France would therefore be relevant only to a finding that he had "firmly resettled" in a third country before arriving in the United States. Because the IJ found explicitly that Tandia was *not* firmly resettled, the portion of the IJ's decision relying on Tandia's stay in a third country before arriving in the United States cannot support a denial of Tandia's asylum claim.

## III.

■ We now turn to the merits of Tandia's asylum claim. We review the factual findings of an IJ for "substantial evidence," *see, e.g., Majidi v. Gonzales*, 430 F.3d 77, 81 (2d Cir.2005), and the administrative "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Borovikova v. DOJ*, 435 F.3d 151, 154 (2d Cir.2006) (quoting 8 U.S.C. § 1252(b)(4)(B)). When, as in this case, an IJ denies asylum upon an adverse credibility finding, our review is especially deferential. *See Zhou Yun Zhang*, 386 F.3d 66, 74 (2d Cir.2004).[10] Nonetheless, we require that an IJ's reasons for such a finding be "specific" and "cogent," *Majidi*, 430 F.3d at 80 (quoting *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003)), and that a "legitimate nexus" exist between these reasons and a "petitioner's claim of persecution," *Xu Duan Dong v. Ashcroft*, 406 F.3d 110, 112 (2d Cir.2005) (quoting *Secaida–Rosales*, 331 F.3d at 307).

■ We conclude that the evidence relied upon by the IJ to find that Tandia did

---

8. A "safe third country" finding made while the former 8 C.F.R. § 208.13(d) remained in force would of course be reviewed according to the standard set forth in that regulation, which states that an "asylum application *may* be denied in the discretion of the Attorney General if the alien can be removed to a third country *which has offered resettlement* and in which the alien would not face harm or persecution." *See* 62 Fed.Reg. 10312, 10342 (Mar. 6, 1997) (emphases supplied). The primary distinction between this language and that governing "firm resettlement findings," 8 C.F.R. § 208.15, is that one is "firmly resettled" only upon "an offer ... of *permanent* resettlement." *Id.* (emphasis supplied). Denial is mandatory when an asylum applicant has such a permanent resettlement offer, *id.*, whereas a non-permanent offer formerly gave the Attorney General "discretion" to deny an asylum application.

9. The regulation defining "firm resettlement" is the only provision currently in force denying asylum to aliens based on their ability to find refuge in a country other than the United States.

10. We observed in *Zhou Yun Zhang* that "[w]here the IJ's adverse credibility finding is based on specific examples in the record of inconsistent statements by the asylum applicant about matters material to his claim of persecution, or on contradictory evidence or inherently improbable testimony regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise." 386 F.3d at 74 (internal quotation marks omitted).

not suffer or fear persecution does not constitute "substantial evidence." The asylum interview about which the IJ questioned Tandia closely was apparently not recorded anywhere in the record before the IJ, nor is it available to us on review. Based on our review of Tandia's responses to the IJ's questions about his asylum interview, we conclude that the IJ's reliance upon that testimony to find Tandia not credible involved impermissible speculation and conjecture. Specifically, the IJ stated that Tandia's testimony to the effect that he could not remember whether he had made certain statements at his asylum interview implied that the potential statements might in fact be true.[11] From our review of the record in this case, we cannot conclude that Tandia's inability to remember whether he made certain statements to the asylum officer—during a conversation of which there is apparently no available record—allows an inference that he made such statements and that, because such statements would undercut his asylum claim, Tandia's testimony before the IJ lacked credibility.

The IJ devoted a significant portion of his discussion of the merits of Tandia's asylum claim to a review of Tandia's inability to recall portions of his asylum interview. Having found that evidence unpersuasive, we cannot state with confidence that the IJ would deny Tandia's application were we to remand the cause to the BIA.[12] *See Xiao Ji Chen v. DOJ*, 434 F.3d 144, 148 (2d Cir.2006) (denying petition for review after concluding upon substantial evidence review that "despite errors—considered in the context of the IJ's entire analysis—we can state with confidence that the IJ would adhere to his decision were the petition remanded"). We therefore conclude that the IJ's adverse credi-

---

11. For example, the IJ asked Tandia whether he told the asylum officer that he was "not personally affected by the events in Mauritania until [he] lost [his] job at the bank," raising an issue that goes to whether Tandia is merely an economic immigrant rather than a refugee. In his decision, the IJ said in regard to this exchange that Tandia

> testified that he does not remember if he told the asylum officer at the time of the asylum interview that he had not been affected by the situation in Mauritania until he lost his job in the bank even though he was performing well in that position. Now the fact that [Tandia] testified that he does not remember whether he told the asylum officer that raises a critical credibility issue because if this never actually happened, that is if it was never true that [Tandia] had not been affected in Mauritania until he lost his job in the bank, there would be no reason for [Tandia] in court saying that he does not remember if he said that or not. Now this is critical because, again, if that never happened, that is if it is absolutely not true that he had not been affected in Mauritania until he lost his job in the bank even though he was performing well in that position, [Tandia] would never have said

> that if that was not true and, therefore, when he was asked in court regarding this he would not be expected to reply to the question that he does not remember whether he said this. One would have expected him to say I could not have said [that]. I never said that because that never happened. The fact that [Tandia] answered that question by stating that he does not remember whether he said that leaves open the possibility that he did in fact say that. Now if he did say that to the asylum officer then his claim is totally incredible.

12. We do not, however, conclude that the IJ identified *no* evidence in her comprehensive decision that might support a denial of Tandia's application on remand. Tandia's failure to produce evidence of his activities with FLAM in the United States would be relevant, as would Tandia's arrests for minor crimes in the United States and the IJ's finding that most of Tandia's evidence concerned the plight of black Africans generally in Mauritania rather than his own alleged persecution. Whether Tandia's application satisfies his burden of proving his persecution is a question for the BIA to consider in light of our conclusions regarding the IJ's analysis of Tandia's testimony.

bility finding, as articulated in his decision, was not supported by substantial evidence.

**Conclusion**

For the foregoing reasons, the petition for review is granted, the order of the BIA is vacated, and the cause is remanded to the BIA for further proceedings.